**D.M., et al., Plaintiffs,**

v.

**Jack TERHUNE, Commissioner of the Department of Corrections, et al., Defendants.[1]**

No. Civ.A. 96–1840(AET).

United States District Court, D. New Jersey.

July 30, 1999.

---

1. The original caption was *C.F. v. Fauver* and has been changed to reflect the substitution of the current class representative and the Com-missioner of the New Jersey Department of Corrections.

Patricia P. Perlmutter, Newark, NJ, Sandra L. Cobden, DeBevoise & Plimpton, New York City, for plaintiffs.

Deputy Attorney General Diane M. Moratti, Office of the New Jersey Attorney General, Trenton, NJ, Stephen D. Holtzman, Lally, Holtzman, Gilligan, Duffin & Quasti, Linwood, NJ, Paul R. Murphy, Kalison, McBride & Jackson, Liberty Corner, NJ, for defendants.

## MEMORANDUM OPINION

HUGHES, United States Magistrate Judge.

This matter comes before this Court pursuant to FED.R.CIV.P. 23(e) for approval of a proposed settlement agreement ("the Settlement") entered into by the Plaintiffs and Defendants. The Court has considered the written submissions of the parties, 350 responses to the Settlement by certain members of the class, the record of the fairness hearing, held on July 6, 1999, and the Settlement itself.

The parties have consented to the jurisdiction of the United States Magistrate Judge, for all purposes, pursuant to 28 U.S.C.A. § 636 and FED.R.CIV.P. 73.

## I. *BACKGROUND*

Plaintiffs allege civil rights violations, pursuant to 42 U.S.C.A. § 1983 and violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12132. Specifically, Plaintiffs, a group of inmates with mental disorders in the New Jersey State Prison system, assert that they have been unlawfully denied treatment and medication for their mental disorders. Plaintiffs contend that the deprivation of medical treatment violates their right against cruel and unusual punishment as well as their right to be free from discrimination for their disabilities pursuant to the ADA. Defendants, to the contrary, contend that Plaintiffs' mental health treatment is adequate and that it complies with the United States Constitution and the ADA.

## II. *PROCEDURAL HISTORY*

On April 11, 1996, a class action complaint was filed against the Commissioner of the New Jersey Department of Corrections and various other officials in the Department of Corrections ("DOC"). On November 20, 1996, the Court granted Plaintiffs' motion for certification of a class action, pursuant to FED.R.CIV.P. 23.

On July 18, 1997, a motion was granted allowing Plaintiffs to amend their complaint. The amended complaint joined Correctional Medical Services, Inc. ("CMS"), and Correctional Behavioral Services, Inc. ("CBS"), as co-defendants. CBS and CMS are private contractors engaged by the state of New Jersey to provide mental health services to inmates.

CBS, CMS, and the DOC moved for summary judgment. Plaintiffs filed a cross-motion for summary judgment thereafter. The summary judgement motions were dismissed as moot on April 29, 1999, after the parties agreed to settle this matter.

Discovery related to this case has been immense, leading to the production of more than 12,000 pages of documents. In addition, the parties took over thirty depositions and conducted three extensive inspections of the New Jersey prisons.

Intense settlement negotiations and conferences began in November of 1998 and continued through March of 1999. The result of these conferences and negotiations was the Settlement. The Court conducted a fairness hearing on July 6, 1999, and the Court hereby grants final approval of this Settlement.

### III. SETTLEMENT AGREEMENT[2]

The Settlement consists of five major parts: (1) amendments to the DOC disciplinary regulations, (2) a mental health treatment plan, (3) a statement on new policies and procedures by the DOC, (4) the funding, monitoring and enforcement of the Settlement, and (5) liability of Defendants. Separate and apart from the Settlement, the parties entered into an agreement on attorneys fees and costs, but only after the Settlement benefitting the inmates had been agreed upon. The following discussion in this section will summarize each part of the Settlement and the fee agreement.

### A. Amendments to the DOC Disciplinary Regulations

The DOC agreed to change parts of its disciplinary regulations. Under the new regulations, all prisoners with pending disciplinary charges will have their names given to the mental health staff before their disciplinary hearing. The mental health staff will inform the disciplinary hearing officer whether the individual charged is undergoing mental health treatment.

The hearing officer, based on all the information available to him, will decide whether or not to request a psychological or psychiatric evaluation of the prisoner. The hearing officer will consider all the information, including the evaluation, before deciding whether punishment will be imposed on the prisoner. Instead of, or in addition to, the sanctions imposed on the prisoner, the hearing officer may also refer a mentally ill prisoner to the mental health unit for appropriate care and treatment.

Additionally, if a prisoner is confined in disciplinary detention, and suffers a deterioration on his or her mental health status, the mental health staff will refer the matter to the administrator of the prison where the inmate is held. The Special Administrative Segregation Review Committee shall release the prisoner from Administrative Segregation if the prisoner has a history of mental illness and the Committee decides that continued confinement in the unit would be harmful to the prisoner's mental health.

### B. Plan for Mental Health Treatment

All new prisoners will receive a mental health assessment within 72 hours of arrival. The DOC will ensure that there is an adequate number of staff to serve the entire prison population. Correction officers, internal affairs investigators, disciplinary hearing officers and administrators will receive additional training about mental illness and dealing with mentally ill prisoners.

The DOC will create three Stabilization Units ("SU"), for the purpose of treating mentally ill prisoners experiencing a mental health crisis. These units will be located at Northern State Prison, New Jersey State Prison, and the Edna Mahan Correctional Facility for Women. The DOC will also create Residential Treatment Units ("RTU"), and Traditional Care Units ("TCU"). After discharge from the SU, the RTU will provide a structured and supportive environment for mentally ill

---

**2.** The settlement document, without appendices, has been filed with the Clerk of Court and, by reference, is made part of this Opinion and accompanying Judgment Orders and Settlement Stipulations.

prisoners unable, due to their illness, to be transferred to the general population. The TCU will help prisoners with less severe mental illness to make a gradual adjustment to the general population. The decision about placing prisoners in these units will be determined by the mental health staff.

### C. *Policies and Procedures*

The DOC agrees to review or create five general types of policies and procedures in order to implement the Settlement: (1) any policies and procedures consistent with the goals of the plan and the amendments to the disciplinary regulations; (2) involuntary medication policies and procedures, including those describing the difference between emergency and non-emergency involuntary medication; (3) polices and procedures on the use of force situations involving class members which provide for input from the mental health staff; (4) medication policy and procedures regarding medication administration, medication prescription, management of medication, inmate non-compliance and formulary lists; and (5) discharge planning for class members in anticipation of their release from DOC facilities with minimum requirements, as outlined in the Settlement, that must be met.

Defendants will submit the new or revised policies and procedures to the Monitor. Additionally, Defendants agree to implement these policies and procedures to ensure continued compliance with the Settlement.

### D. *Funding, Monitoring and Enforcement*

The Settlement requires that enough funding must be allocated by the State of New Jersey to implement this program through the Fiscal Year 2000. The Governor recommended, and the New Jersey Legislature approved $16,000,000 to implement the Settlement. The Commissioner of the Department of Corrections certifies that $16,000,000 is sufficient to implement the Settlement. Therefore, the Court finds that funding is available to implement the program.

Dr. Raymond F. Patterson, a forensic psychiatrist, will be appointed as an independent mental health expert to oversee Defendants' compliance. Dr. Patterson has a distinguished career in psychiatry and correctional services. (*See* Class Counsel Decl., Exhibit A, Patterson Curriculum Vitae ("Patterson C.V.").) He graduated from Northwestern University in 1973 and went on to receive his M.D. from Howard University College of Medicine in 1977. (*See* Patterson C.V.) In medical school, Dr. Patterson received the National Medical Fellowship Incorporated Scholarship Clinical Psychiatry Award. (*See id.*) His numerous professional awards include the Mental Hygiene Administration Certificate of Appreciation for Risk Management/Quality Assessment Program, and the Department of Human Services Distinguished Service Award; both of which were awarded in October 1992. (*See id.*) Presently, Dr. Patterson is serving as the Director of Forensic Services for the Commission on Mental Health Services in Washington, D.C. (*See id.*) From May 1997 until February 1998, he worked as the Chief Psychiatrist for the Department of Public Safety & Correctional Services in Baltimore, Maryland. (*See id.*) In addition, Dr. Patterson is currently on staff as an Associate Professor of Psychiatry at the following schools: Howard University College of Medicine, the Institute of Psychiatry and Human Behavior at University of Maryland School of Medicine, and Georgetown University Department of Psychiatry. (*See id.*) Dr. Patterson has also authored numerous papers on mental health and spoken to various professional groups across the country on this topic.

Dr. Patterson will inspect the DOC facilities four times a year. He will be able to interview prisoners and staff during his inspection. After each inspection, Dr. Patterson will write a report explaining

whether the DOC has substantially complied with the Settlement. Dr. Patterson's report will be confidential, except for copies to the medical and mental health service providers under contract with the DOC, Defendants, counsel to the Plaintiffs, and any former employee witnesses, outside non-party consultants, or experts listed in the Settlement. The inmates will not have access to the report. If the DOC has not substantially complied with the Settlement, it has a limited number of chances to correct the problem. Once the DOC is in full compliance for twelve continuous months, then the Settlement will terminate.

Prisoners concerned with their mental health care may submit their grievances directly to the Director of Health Services Unit or to the Plaintiff class counsel, who will then forward these concerns to Dr. Patterson, as well as to the contractors providing medical and health services.

The Plaintiffs, *only through class counsel,* may sue to enforce this agreement in New Jersey State Court. No other individual or group of prisoners may sue to enforce this agreement, and Plaintiffs' counsel may not bring such a suit unless Dr. Patterson finds that the DOC is not in compliance with the Settlement.

### E. *Liability*

This Settlement is an agreement between Plaintiffs and the DOC. The DOC makes no admission of liability as to the Plaintiffs' claims. Plaintiffs agree to dismiss their claims against the DOC, CMS and CBS with prejudice. All cross-claims between Defendants will be dismissed with prejudice.

### F. *Attorneys Fees and Costs*

As part of this agreement, the DOC will pay the Plaintiff class counsel a total of $1,220,000, in resolution of all attorneys fees and costs incurred by Plaintiffs' counsel in litigating this case. Plaintiffs' counsel normal rate for fees and costs would have amounted to more than $3,900,000. Since counsel undertook the representation on a *pro bono* basis, and since their primary objective was the improvement of mental health care for prisoners, they agreed to cut their costs over 67% and accept a lower amount. Significantly, this agreement was reached *after* the substantive settlement was agreed upon.

### IV. *NOTICE TO CLASS*

On May 15, 1999, this Court signed an order requiring distribution of the notice of the proposed Settlement to all class members. Approximately 2,455 notices were distributed to the class. The notice contained a copy of the Settlement, a plain language summary in English and Spanish, and a comment sheet, all of which were enclosed into a sealed envelope. The class members were required to have all comments postmarked by June 25, 1999. The Court, on its own initiative, decided to consider any comment received by July 28, 1999. (Only two additional comments were received).

The Court determined that this distribution of the proposed settlement and comment sheets was the most appropriate means for providing notice to the class members in accordance with the FED. R.CIV.P. 23(e).

### V. *RESPONSE OF CLASS*[3]

The members of the Plaintiff class submitted comments in response to the Settlement. As a result, class counsel received comments from 345 inmate class members. (*See* Sandra L. Cobden, Esquire letter,

---

**3.** The Court was presented with two sets of responses (four binders in each set from class counsel) which were identical except that one set had the name/number of inmates redacted. Judge Hughes read each one of the 345 individual responses, and an intern was as-signed to read every response in the redacted set. Both sets were then cross-checked to assure that each and every response was considered before deciding whether to approve the Settlement.

dated July 1, 1999 ("Cobden's July letter").) The Court directly received 14 responses, of which 9 were duplicates of responses sent to class counsel. A total of 350 different responses were received and read. After reviewing the inmate responses and class counsel's assessment of the comments, the Court is satisfied that, on balance, the class members support the Settlement.

Of the 350 responses, 270 prisoners submitted responses relevant to the issues raised by this action. The other 80 comments raised general complaints concerning treatment by mental health, correctional, and disciplinary personnel; asked for a referral; or sought clarifications regarding the Settlement. (*See* Cobden's July letter at n. 1.) Of the 270 comments addressing this action, 170 responses addressed the terms of the Settlement. Of those 170 letters, 89 prisoners indicated that they approved of the Settlement. Notably, 15 of those 89 prisoners who approved of the Settlement also expressed concerns or criticism regarding particular provisions. (*See id.* at 2, n. 2.)

### A. *Objections to the Settlement Agreement*

Eighty-one responses objected to the Settlement. (*See* Declaration of Sandra L. Cobden and Patricia Perlmutter ("Class Counsel Decl.") at 5.) The objections to the Settlement raised the following issues: (1) the relief sought was merely injunctive; (2) the Settlement did not provide for monetary relief; (3) inmates protested as to their inclusion in the class; (4) inmates expressed their concern that the Settlement will not be enforced; (5) the Settlement failed to modify the parole process for mentally ill prisoners; (6) the Settlement did not include a provision for retroactive relief for prisoners who lost commutation ("good time") credits and/or were sanctioned with administrative segregation based on behavior predating the Settlement which was a product of their mental illness; (7) the scope of relief provided

under the Settlement to prisoners being released was inadequate; (8) criticism of class counsel's fee award; (9) a need for heightened security measures for class members; (10) the dangers of forced medication; (11) a need for bilingual mental health clinicians. Many responses addressed more than one issue.

The first two objections, concerning the availability of injunctive and/or monetary relief, were grounded on a misunderstanding of the nature of the action which sought only injunctive relief pursuant to Federal Rule of Civil Procedure 23(b)(2). Rule 23(b)(2) provides, in pertinent part:

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied [numerosity, commonality of claims, typicality of claims, and adequacy of representation], and in addition: ... the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby *making appropriate final injunctive relief* or corresponding declaratory relief with respect to the class as a whole...."

FED.R.CIV.P. 23(b)(2) (emphasis added). Given the nature of this action and the relief sought, it is appropriate that the Settlement solely provides for injunctive relief. Although monetary damages were not available here, class members are not precluded, as a result of their participation in this action, from pursuing individual claims for monetary damages as otherwise permitted by law.

Approximately 21 inmates protested their inclusion in the class. Some argued that they were not suitable class members because they did not suffer from a mental illness; others feared retribution from prison personnel; and others simply did not want to participate. The Court is certainly aware of, and sensitive to, the respective positions of these 21 inmates. Considering that less than 10% of the inmates who submitted responses do not want to participate in the Settlement, however, the Court is not convinced that class composition should be disturbed or that

the Settlement is not a positive resolution of this matter for the class members.

Approximately 24 comments expressed concern about the adequacy of the Settlement's enforcement mechanisms. Under the Settlement, Dr. Patterson, an expert in correctional mental health care, (*see supra* at III(D)), will conduct inspections of DOC facilities four times per year. If Dr. Patterson finds that the DOC is not in compliance with the Settlement, Plaintiffs' counsel may bring an enforcement action in New Jersey State Court. (*See* Class Counsel Decl. at 6.) Plaintiffs are foreclosed from suing for enforcement in Federal Court or to sue on claims with the substantially same facts as alleged in this action. (*See* Class Counsel Decl. at 6.) However, Plaintiffs can sue for any new claims in Federal Court arising after the date of the Settlement, as otherwise permitted by law. The Court is convinced, due to Dr. Patterson's impressive qualifications, the commitment of Plaintiffs' counsel, and the availability of New Jersey State Courts, that the Settlement has a satisfactory enforcement mechanism.

Several objectors commented that the Settlement does not address the weight given mental illness in assessing prisoners' eligibility for parole. However, parole procedures were outside the scope of this litigation. (*See* Class Counsel Decl. at 8.) Parole procedures are governed by the New Jersey Board of Parole, which was not a defendant here.

Similarly, several inmates complained that the Settlement did not provide for retroactive relief for prisoners who lost commutation ("good time") credits and/or were sanctioned with administrative segregation based on behavior, which was a product of their mental illness, predating the Settlement. During the settlement negotiations, Plaintiffs' counsel declined to pursue this demand for several reasons. First, the regulatory changes in the Settlement "allow for the transfer of appropriate candidates from administrative segregation to the new mental health units begin-

ning on July 1, 1999, even if the prisoner's confinement was the result of actions prior to the Settlement...." (Class Counsel Decl. at 9.) The regulatory changes also allow for the removal of mentally ill prisoners from administrative segregation of a prospective basis, if the confinement endangers their mental health. (*See id.*) Second, the DOC refused to undertake such a retrospective review on the grounds that it "would require a reconstruction of prisoners' mental states at the time of the infractions at issue, often in the absence of a contemporaneous mental evaluation." (*See id.*) Third, class counsel indicated that such relief may be more appropriate as part of an individual 42 U.S.C.A. § 1983 action, rather than this class action Settlement.

A number of prisoners commented on what they perceived to be insufficient attention to discharge planning. However, the Settlement contains several provisions addressing this concern. The Settlement provides for a two week supply of medication to all class members upon their release and for the dissemination of information on social service assistance available in the community. (*See id.* at 8.) The relief available concerning discharge planning was limited by practical considerations because discharged prisoners are obviously no longer in the DOC's custody. Therefore, the Court is satisfied with the Settlement in this regard.

Several class members criticized the $1.22 million fee awarded to class counsel. As discussed *infra* at VIII, the Court is satisfied that the fee award is reasonable. Moreover, the Court finds that the fee award does not reduce the benefits to be obtained by Plaintiff class as a result of the Settlement. In fact, the fee award was not negotiated with counsel for Defendants until all other terms of the Settlement had been resolved. (*See id.* at 6.)

Plaintiffs' responses also expressed concerns regarding the dangers of forced medication. The Court is confident that

the provisions of the Settlement will address this concern by virtue of the vastly increased mental health staff and periodic inspections of DOC facilities by Dr. Patterson. Under the Settlement, the DOC will create special needs units in which mentally ill prisoners will receive an extensive program of treatment. (*See* Class Counsel Decl. at 14.) For instance, SUs will provide acute care to prisoners in crises. (*See id.*) In an SU, each prisoner's care will be decided upon by a treatment review committee, and will be set forth in a comprehensive treatment plan. (*See id.*) The Settlement also provides for specific prisoner/staff ratios which must be maintained. In the SUs, there will be 1 psychiatrist for every 35 prisoners, 1 psychologist for every 50 prisoners, and one licensed clinical social worker for every 25 prisoners. (*See id.* at 15.) The special needs units will also be staffed by psychiatric nurses. By stark contrast, one year ago, there was the equivalent of 5 full-time psychiatrists in the entire DOC system, each serving approximately 400 mentally ill prisoners. (*See id.*)

Finally, several responses noted a need for heightened security for class members and bilingual mental health clinicians. Although these concerns were not addressed directly by the Settlement, the Court is persuaded that the Monitor will serve as a safeguard against any abuse of the Settlement.

## B. *Appointment of a Guardian Ad Litem*

■ The next issue before the Court is whether the appointment of a guardian *ad litem* is necessary for the approval of the Settlement. Pursuant to FED.R.CIV.P. 17(c), the Court shall appoint a guardian *ad litem* "for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person." The decision to appoint a guardian *ad litem* is subject to the Court's discretion. *See*

*Gardner by Gardner v. Parson*, 874 F.2d 131, 140 (3d Cir.1989). While the Court is empowered to appoint a guardian, "it may decline to do so if the child's interests may be protected in an alternative manner." *Gardner*, 874 F.2d at 140.

Here, Plaintiff class consists of prisoners with serious mental disabilities. Some members of the class are legally incompetent, but many members are not incompetent. (*See* Sandra L. Cobden, Esquire letter, dated December 7, 1998 ("Cobden Dec. letter").) Nevertheless, the Court has presided over this case for over three years and has developed a sufficient degree of familiarity with the facts of the case to determine the Settlement's fairness for Plaintiffs. *See Eagan by Keith v. Jackson*, 855 F.Supp. 765, 782 (E.D.Pa. 1994) (the court declined to appoint guardian ad litem, in light of familiarity with the case). In addition, the Court has heard and assessed the views of Plaintiffs' expert, Dr. Koson, on several occasions, including an evidentiary hearing. Notably, in assessing the Settlement, Dr. Koson recently stated that "the proposed reforms represent a tremendous improvement over the prior state of affairs. If successfully implemented, I believe these changes will significantly improve the quality of care afforded mentally ill prisoners in New Jersey." (Koson Decl. at 4.)

■ The Court has also reviewed the letters submitted by the members of the class in response to the Settlement. The Court found the inmates' letters to be highly instructive in determining the need for a guardian *ad litem*. Moreover, class counsel believes that the interests of mentally incompetent prisoners will be adequately protected by the Settlement. (*See* Cobden Dec. letter at 2.) The Court also notes that the appointment of a guardian *ad litem* would be time consuming and expensive, delaying implementation of a settlement that will vastly improve mental health care in the New Jersey State Prison system. Finally, the Court firmly believes that Dr. Patterson's role in inspection and

reporting is the functional equivalent of a guardian *ad litem,* ensuring compliance with a Settlement that the Court finds to be fair, reasonable and adequate. As a result, the Court finds that the appointment of a guardian *ad litem* is neither necessary nor warranted. The Court also notes for those who might review the record that the substantial number of responses and the clarity of the thought expressed in many of the comments belies a finding of incompetence requiring appointment of a guardian *ad litem* for the class.

## VI. *LEGAL STANDARD FOR APPROVAL*

A class action "shall not be dismissed without the approval of the court." FED.R.CIV.P. 23. "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." *Girsh v. Jepson,* 521 F.2d 153, 156 (3d Cir.1975). "To approve a proposed settlement, the court must be satisfied that the agreement is fair, adequate and reasonable and not the product of fraud or collusion." *In re Matzo Food Products Litigation,* 156 F.R.D. 600, 604 (D.N.J.1994) (citing *Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990)).

In determining whether a settlement is fair, reasonable, and adequate, a court must weigh the following factors: (1) the complexity, expense and likely duration of the litigation, (2) the reaction to the class settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of the reasonableness of the settlement in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Girsh,* 521 F.2d at 157;

*Stoetzner v. United States Steel Corp.,* 897 F.2d 115, 118 (3d Cir.1990) (citing *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2nd Cir.1974)). "The findings required by the *Girsh* test are factual ... which will be upheld unless they are clearly erroneous." *In Re General Motors Corp. Pick–Up Truck Fuel Tank,* 55 F.3d 768, 786 (3d Cir.1995) (citations omitted).

The Third Circuit Court of Appeals outlines general principles to be followed to determine whether a settlement "represents a good value for a relatively weak case or a sell-out of an otherwise strong case." *In Re General Motors,* 55 F.3d at 806 (holding that the settlement was not fair, adequate or reasonable since it was agreed upon too quickly with too little development on the merits). "According to *Girsh,* courts approving settlements should determine a range of reasonable settlements in light of the best possible recovery ... and a range in light of all the attendant risks of litigation." *Id.* In cases primarily seeking monetary relief, the present value of the damages the plaintiffs would likely recover, if successful, discounted by the risk of not prevailing, should be compared to the proposed settlement. *Id.* "The evaluating court must ... guard against demanding too large a settlement based on its view of the merits of litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *Id.*

## VII. *FAIRNESS OF SETTLEMENT AGREEMENT*

Factors one and three of the *Girsh* analysis require an evaluation of the complexity and likely duration of the litigation, the stage of the proceedings, and the amount of discovery completed. At the time of this settlement, the parties involved had undergone extensive discovery, including the production and review of over 12,000 pages of documents, over thirty depositions, and three extensive inspections of New Jersey prisons attended by each par-

ty's experts. (*See* Class Counsel Decl. at 11.) The production of this work spanned a period of over three years. The parties had not yet argued their summary judgment motions, filed any pre-trial motions, nor prepared a final pretrial order.

The likely duration of the trial would have been many weeks, judging from the extensive witness lists by both parties and the broad sweep of the subject matter before the Court. Regardless of the outcome of the trial, post-trial briefings and appellate arguments would have likely required substantial time commitments by the litigants and the Court. This settlement occurs at an appropriate time in the litigation process, saving vast amounts of time and resources while still immensely benefitting inmates.

In addition, proceeding with the litigation would only postpone the implementation of necessary measures to remedy the deficiencies in the DOC's system for the delivery of mental health treatment. Such a delay would leave the class members without necessary care and increase the chance that untreated mentally ill patients would harm themselves or others. (*See* Class Counsel Decl. at 4). It is prudent at this time to accept the Settlement since the potential costs of the trial in time and resources is outweighed by the benefits of the Settlement.

The second *Girsh* factor requires an analysis of the reaction of the class to the settlement. As noted *supra* at V(A), the Court is satisfied that the class members' responses, when viewed collectively, endorse the Settlement.

The fourth *Girsh* factor concerns the risks of establishing liability. The Plaintiffs acknowledge that there are significant risks in establishing liability. In addition, they also acknowledge that the Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997, places limits on the scope of relief for prisoners in federal court. Class counsel believe they could have prevailed, but the risks were significant. (*See* Class Counsel Decl. at 11–12). A settlement of

this type avoids such risks. The Settlement is also otherwise compliant with the PLRA.

The fifth factor, the risk of establishing damages, is not applicable here because Plaintiffs only sought injunctive relief. Therefore, this factor does not disfavor settlement.

The seventh *Girsh* factor is the ability of the defendants to withstand a greater judgment. The DOC defendants are government employees. The ability of a governmental unit to withstand a greater judgment is not particularly applicable and is not a factor considered by this Court.

The eighth factor is whether the Settlement is reasonable in light of the best possible recovery after a trial. The Settlement achieves most of what Plaintiffs could have hoped to accomplish through an order following a trial. It grants relief addressing the central problems asserted in this litigation. The Settlement amended the DOC's disciplinary regulations to allow for the consideration of mental illness in its proceedings. The Settlement will create other avenues of treatment for mentally ill patients besides psychotropic medications. The Settlement will substantially enlarge the mental health staff and require the maintenance of certain prisoner-staff ratios. It also calls for yearly mental health training for each correctional officer. The Settlement also creates a more efficient information system to track the status of each class member's health. Finally, it provides for a qualified mental health expert to ensure compliance.

The last factor to consider is the range of reasonableness of the Settlement to a possible recovery in light of all the attendant risks of litigation. The Settlement establishes a greatly improved system for addressing the needs and problems of mentally ill prisoners in New Jersey. Given the extent to which Plaintiffs achieved their ultimate goals, there is no reason for Plaintiffs to incur the risks of litigation by proceeding with a lengthy trial. There-

fore, the Court finds that the Settlement is a fair, reasonable and entirely adequate resolution for Plaintiffs, considering the attendant risks of litigation and the marginal additional relief possible from a favorable outcome.

The *In re General Motors* analysis used the present value of the damage award as a comparison against the present value of the potential award minus the risks of litigation. Unlike the *In re General Motors* case, the instant case does not easily lend itself to a present value calculation because the main remedy sought was injunctive relief. Therefore, this Court will look at the reasonableness of the Settlement as compared to the potential maximum recovery through litigation while taking into account the risks facing Plaintiffs.

In part, the Settlement creates three new mental care units and provides for a larger staff with better training. The Settlement also was contingent on the State of New Jersey funding $16,000,000, to implement the various elements of the agreements, which it allocated in this year's budget. The Court finds that $16,000,000 is sufficient for the implementation of the entire Settlement. The Settlement was within the range of the best possible recovery for the Plaintiffs.

There are also risks and costs associated with continuing the litigation. There are risks that Plaintiffs would lose or achieve less than this Settlement at the completion of litigation. Some costs of the litigation, which are essentially unquantifiable, include damage to the class members' mental health due to a lack of adequate mental health treatment during the protracted litigation and the increased risks of injuries or death to class members or others. Additionally, attorneys fees, and costs, as well as the Court's time and resources, would be substantial. Therefore, this Court finds that the value of immediate mental health service and care to the class outweighs the potential maximum benefit to the class in light of the risks and costs of litigation.

According to the principles set forth in the *In re General Motors*, this Court finds that the Settlement is a "good value" for Plaintiffs' case. The Settlement falls within the best possible recovery Plaintiffs could hope for in light of all the attendant risks of litigation. Additionally, unlike the *In re General Motors* case, this Settlement was agreed upon after three years of litigation, with extensive discovery and a great deal of development of the merits of the case with which this Court is intimately familiar. This Settlement represents a compromise between the parties, where Plaintiffs yielded their highest hopes of achievements in exchange for certainty and resolution. Therefore, this Court concludes that this Settlement adheres to the principles outlined by the Third Circuit Court of Appeals in the *In re General Motors* decision.

## VIII. *REASONABLENESS OF FEES AND COSTS*

42 U.S.C. § 1988(b) allows the prevailing party in a 42 U.S.C. § 1983 action to recover reasonable attorneys fees and costs. "To qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendants ... through a consent decree or a settlement." *Alexander v. Boyd*, 113 F.3d 1373, 1388 (4th Cir.1997) (quoting *Farrar v. Hobby*, 506 U.S. 103, 111, 113, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). As discussed throughout this Memorandum of Opinion, Plaintiffs achieved substantial relief on the merits through the Settlement. Accordingly, the Court finds that the Plaintiff class was the prevailing party in this litigation.

The calculation of the amount of attorneys fees is normally calculated by determining the "lodestar." The "lodestar" is the number of hours reasonably expended multiplied by the applicable hourly market rate for legal service. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76

L.Ed.2d 40 (1983). Section 803(d) of Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(d)(3), places a cap on the size of attorneys fees. The award of attorneys fees shall be based on an hourly rate no greater than 150% of the hourly rate allowable under 18 U.S.C. § 3006(A). (The Criminal Justice Act). *Martin v. Hadix,* 527 U.S. 343, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999). Additionally, § 803(d) only limits "attorney fees with respect to ... services performed after the PLRA's effective date but it does not so limit fees ... before the effective date." *Id.* at 2000.

The fees awarded in the instant case are well within the PLRA guidelines. The class counsel completed approximately 13,-860 hours of work. The current hourly rate under §. 3006(A) in the District of New Jersey is $75, which comes to $112.50 after the multiplier of the PLRA, therefore establishing a total cap of approximately $1,559,250. (75*1.50*13,860). This cap does not account for the hours worked . before the enactment of the PLRA, which is not limited in the hourly fee charged nor fees permitted by the ADA.

■ The Settlement grants $1,220,000 to class counsel, *including* costs. This is well below the cap allowed under the PLRA. Defendants do not object to this amount, and they negotiated it at arms length after the substantive Settlement had been consummated. The Court is not permitted to "decrease a fee award based on factors not raised at all by the adverse party." *See Rode v. Dellarciprete,* 892 F.2d 1177, 1183 (3d Cir.1989) (citing *Bell v. United Princeton Properties, Inc.,* 884 F.2d 713 (3d Cir.1989)). Therefore, the Court finds that the agreement on attorneys fees is reasonable.

## IX. *CONCLUSION*

For the reasons stated in this opinion, the Court finds that the Settlement is fair, reasonable, and adequate. The Court further finds that the Settlement provides for a significant modernization of mental health treatment in New Jersey State Prisons, that would not have been realized but for this litigation. In addition, the Court finds that the resolution of attorneys fees and costs is reasonable, given the work expended and the result achieved. Finally, the Court finds that both the Settlement benefitting the Class and the settlement on fees and costs are within the restrictions imposed by the Prison Litigation Reform Act.

Accordingly, the Court will file the following Orders and Stipulations along with this Memorandum Opinion:

(1) "Order entering Judgment and Dismissal with Prejudice",

(2) "Order of Dismissal as to Defendant, Correctional Behavioral Solutions of New Jersey, Inc.",

(3) "Stipulation of Dismissal as to Defendant Correctional Behavioral Solutions of New Jersey, Inc.",

(4) "Order of Dismissal with Prejudice as to Correctional Medical Services, Inc."

(5) "Stipulation of Dismissal with Prejudice as to Correctional Medical Services, Inc.",

(6) "Order of Dismissal as to All Cross-claims", and

(7) "Stipulation of Dismissal with Prejudice with respect to all Cross Claims."

## X. *POSTSCRIPT*

From April 19, 1996 to July 27, 1999, the Court conducted approximately forty-three (43) conferences (telephonic or in person) and Court hearings in this case. At least eleven (11) conferences were devoted to settlement negotiations where the Court required the participation of, along with the attorneys and experts, representatives of the DOC (including the Commissioner), CMS and CBS. This Settlement is the result.

Every day, in various prisons throughout this State, professional correctional officers struggle to maintain order while the

vast majority of inmates struggle to serve out their time without incident. The Court firmly believes that this Settlement, though not perfect, will provide basic modern mental health treatment for those inmates who require it. The Court further believes that the Monitor will insure that the privatization of health services in New Jersey State Prisons will enhance, not diminish, effective mental health treatment. This Settlement should also have a positive effect on the general prison population by assisting officers and inmates in their continuing struggle to "get through the day."

The Court commends all the attorneys for their hard work and professionalism, the experts for their assistance to the Court, the representatives of the DOC, CMS, and CBS for their meaningful involvement in the process, and particularly the class members for their many thoughtful and straightforward comments regarding the Settlement.