826 A.2d 735 (2003)
361 N.J. Super. 539
FIREMAN'S FUND INSURANCE COMPANY and Fireman's Fund Indemnity Corporation, Plaintiffs,
v.
John C. IMBESI, American Motorists Insurance Company, Lumbermens Mutual Casualty Company, North American Beverage Company, Click Corporation of America, Inc., Defendants-Respondents,
Sally James,[1] Defendant-Appellant/ Cross-Respondent,
Harleysville Mutual Insurance Company, Defendant-Respondent/ Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 2003.
Decided July 1, 2003.
*736 Mark S. Stewart, Philadelphia, PA, argued the cause for appellant/cross-respondent James (Ballard Spahr Andrews & Ingersoll, attorneys; Arthur Makadon, admitted pro hac vice, and Anne C. Gillespie, admitted pro hac vice, of counsel; Dean C. Waldt and Mr. Stewart, on the brief).
Joseph A. Venuti, Jr., Mount Laurel (Swartz, Campbell & Detweiler) and Lance J. Kalik, Morristown (Riker, Danzig, Scherer, Hyland & Perretti) argued the cause for respondent/cross-appellant Harleysville Mutual Insurance Company (Mr. Venuti and Mr. Kalik, on the brief).
Before Judges KING, WEFING and LISA.
The opinion of the court was delivered by *737 KING, P.J.A.D.
This is an insurance coverage dispute involving the employers' liability aspect of workers' compensation and employers' liability policies. In the underlying litigation, Sally James sued her former employers, Click Corporation of America, Inc. (Click) and North American Beverage Company (North American), and their principal and her former supervisor, John C. Imbesi (Imbesi). (None of the parties have sought to pursue this litigation anonymously. In view of the subject matter, we use a pseudonym, Sally James, for the claimant-appellant only.) She alleged, among other things, sexual harassment in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-12. She claimed both compensatory and punitive damages. The case settled before trial.
Under the terms of the settlement, a sum of money, $1 million, was paid and a consent judgment was entered in James's favor on her LAD claims, and her claims for negligent transmission of venereal herpes and negligent infliction of emotional distress. The remaining claims were dismissed with prejudice. The entire settlement, $4.15 million, ostensibly represented James's compensatory damages. No portion was attributed to punitive damages.
Imbesi, Click, and North American paid James $700,000, and assigned to her their rights to prosecute and recover from the non-settling insurers. An additional $300,000 was paid by American Motorists Insurance Company (American Motorists), which had provided Click and North American with commercial general liability and excess liability insurance, and Lumbermens Mutual Casualty Insurance Company (Lumbermens), which had provided Click and North American with workers' compensation and employers' liability insurance during fourteen months of James's term of employment. American Motorists and Lumbermens are part of the Kemper group of insurance companies. The parties sometimes collectively refer to American Motorists and Lumbermens as "Kemper." We refer separately to the companies because their interests are somewhat different.
The non-settling insurance companies were: (1) Fireman's Fund Insurance Company and Fireman's Fund Indemnity Corporation (Fireman's), which had provided homeowners' insurance to Imbesi; and (2) Harleysville Mutual Insurance Company (Harleysville), which had provided commercial general liability, excess liability, and workers' compensation and employers' liability insurance to Click and North American during a five-month portion of James's employment. Both Fireman's and Harleysville denied coverage for James's claims. They did not participate in negotiating the settlement.
This lawsuit which focused on coverage for the $4.15 million judgment ensued. The action was for declaratory relief to determine the various insurance companies' rights and responsibilities and to allocate the settlement amount and defense costs in the underlying litigation.
The Law Division judge held that, under the employers' liability policy, Harleysville had been obligated to indemnify and provide a defense to Click and North American with respect to James's LAD claims. However, the judge also found that the overall settlement was unreasonable, collusive and unenforceable against Harleysville. In her final judgment, the judge dismissed all claims against Harleysville, with one exception; Harleysville was held to a duty to reimburse Lumbermens for twenty-five percent of the defense costs ($11,500) it incurred in the underlying litigation in which James claimed damages.
*738 James appeals, claiming the judge erred in refusing to enforce the settlement against Harleysville. Harleysville cross-appeals, claiming the judge erred in holding it was obligated to indemnify and provide a defense to Click and North American with respect to James's LAD claims. We affirm on the appeal and dismiss the cross-appeal.

I
For about nineteen months, between July 1995 and February 1997, James worked as an office manager for Click and North American, in a two-room office located in Ocean City, Cape May County, New Jersey. Imbesi, who for many years had run his family's soft-drink business (the Imbesi Bottling Group), founded and ran both Click and North American, which engaged in the business of manufacturing, marketing, and distributing soft-drink beverages.
Click and North American were small, closely-held corporations. During the period of James's employment, Imbesi was the president, sole shareholder, and sole director of Click. He was the president, majority shareholder, and sole director of North American. In various documents, Imbesi's wife, Patricia, was identified as secretary and treasurer of Click and Imbesi's three brothers were identified as officers and directors of Click. Imbesi admitted that his wife played only a limited role at Click, and his brothers played no role at all.
Imbesi had no superiors at either Click or North American. His subordinate employees consisted of James, Dennis King, and James Burns. While James worked in Ocean City, King and Burns were located in Pittsburgh, Pennsylvania.
The record reflects substantial overlap in the operations of the two corporations. For example, although James, King, and Burns performed services for both Click and North American, they were paid only by Click. The companies shared office space, but only Click paid rent, in the amount of $1 per year, to another of Imbesi's companies. Funds from one company were used to finance the operations of the other. There is also some indication that Imbesi may have commingled his personal and business accounts, using funds from personal accounts to pay corporate expenses and vice versa.

I-A. James's Allegations of Sexual Harassment

During the course of James's employment, neither Click nor North American had a written policy against sexual harassment. Nor did they maintain written employment manuals or guidelines relating to the treatment of sexual harassment claims.
James alleged that during the entire period of her employment at Click and North American, Imbesi made sexual comments to her, exposed his genitalia to her, touched her in a sexual manner, and demanded sexual favors from her. When she rejected his advances, Imbesi became verbally abusive, but he continued to sexually harass and proposition her.
James also alleged that, in about September 1995, two months after her hiring date, she began a sexual relationship with Imbesi. Their sexual activities occurred both in the office and elsewhere. James claimed this relationship was actually coercive; she participated in it only out of fear of losing her job and of Imbesi's potential violence towards her. She alleged that, on occasions when she temporarily ended the relationship, Imbesi became verbally abusive, and his demands for sexual favors were imposed in an increasingly threatening manner. Most significantly, James alleged that one day in December 1996, after *739 driving her home, Imbesi forced his way into her home and raped her.
James also alleged that Imbesi directly tied her participation in their sexual relationship to her compensation and continued employment at Click and North American. For example, James alleged that: (1) in May or June 1996, when she threatened to end the relationship, Imbesi threatened her with the loss of employment and stock options; (2) in July 1996, Imbesi refused to give her the paycheck until she performed sexually; (3) in October 1996, when she told Imbesi she was leaving the company because she "could not take it anymore," Imbesi told her she could not leave; and (4) in October or November 1996, when she refused Imbesi's sexual demands, he withheld her paycheck and said he would have to review her salary.
Finally, James alleged that in February 1997 she was diagnosed with genital herpes, contracting the disease from Imbesi in the fall of 1996. According to James, Imbesi knew he had herpes but never told her. Except on one occasion, he did not wear a condom when they had sex.
James did not receive health insurance through her employment with Click and North American. She claimed that, when she asked Imbesi to pay her medical bills, he demanded that she perform sexual favors in return, which she did out of desperation.
Finally, James alleged that, as a result of Imbesi's abuse, she suffered from severe anxiety, panic attacks, and herpes outbreaks which were painful, humiliating, disruptive of her present marriage, and created risks for complications during any future pregnancy or childbirth. James admitted, however, that she had suffered from emotional problems before meeting Imbesi.
For his part, Imbesi admitted having a sexual relationship with James; he claimed it was entirely consensual. He specifically denied demanding sex in exchange for compensation. However, he admitted making personal loans to James. Supporting Imbesi's claim of a consensual relationship are several personal cards and notes James gave to him during the course of her employment with Click and North American.
As to the issue of venereal disease, Imbesi admitted: he contracted genital herpes in the 1980's; he was aware of his infection during his relationship with James; and he did not advise James that he had the disease. However, Imbesi claimed: he did not believe he was contagious when he was asymptomatic; he was unaware he had subjected James to the possibility of contracting herpes, presumably because he did not have a herpes outbreak during the period of her employment; and he never intended to infect her with the disease.
Imbesi also admitted using company funds to pay James's medical bills. However, he claimed he did so to fulfill a promise he made to her when she began working with the companies. Imbesi denied demanding sex in exchange for these medical payments.

I-B. Imbesi's History of Workplace Sexual Harassment

Between November 1981 and May 1995, Imbesi was employed as president of the 7-Up Bottling Company of Philadelphia, the parent company of his family's soft-drink bottling business. During that period, Imbesi was twice accused of sexual harassment.
First, in 1986, Kimberly Flavin, a receptionist at the 7-Up Bottling Company in Virginia Beach, Virginia, filed a charge of discrimination with the Equal Employment *740 Opportunity Commission (EEOC). Flavin complained that she had been sexually harassed by Imbesi, and fired from her job because she refused Imbesi's sexual advances. That case was settled before any litigation.
Second, in 1995, Deborah Goodwin, an account manager with the 7-Up Bottling Company of Philadelphia, filed a sexual harassment complaint against Imbesi in the Pennsylvania Human Relations Commission followed by a complaint in the United States District Court for the Eastern District of Pennsylvania. Goodwin claimed Imbesi continually made comments of a sexual nature to her, propositioned her, touched her in a sexually offensive manner, and punished her for refusing his sexual demands. She claimed the harassment resulted in her constructive discharge, when she resigned because she could no longer withstand Imbesi's abuse. Imbesi denied Goodwin's allegations of wrongdoing. However, a jury returned a verdict in Goodwin's favor for more than $2 million. In unreported decisions, the court reduced Goodwin's award to $425,041, representing $325,041 in compensatory damages, and $100,000 in punitive damages, the applicable punitive damages cap under Title VII. Goodwin v. Seven-Up Bottling Co. of Philadelphia, 1998 WL 438488 (E.D.Pa. July 31, 1998); Goodwin v. Seven-Up Bottling Co. of Philadelphia, 1998 U.S. Dist. LEXIS 11853 (E.D.Pa. Aug. 3, 1998). The case eventually settled for $1 million.
Over the years, Imbesi also had sexual affairs with other female subordinates. One of those affairs resulted in the birth of a son, as well as a 1995 restraining order against Imbesi in Vermont, based upon an allegation that he had been physically abusive towards the woman and child.

I-C. James's Sexual Harassment Litigation

1. Causes of Action

In April 1997, about two months after she resigned, James filed a complaint against Click, North American, Imbesi, and Imbesi's three brothers, in the United States District Court for the Eastern District of Pennsylvania (Federal Action). James alleged the following causes of action:

Counts One and Two: quid pro quo and hostile work environment sexual harassment, contrary to the LAD, N.J.S.A. 10:5-12;

Count Three: gender-motivated violence, contrary to the Violence Against Women Act (VAWA), 42 U.S.C.A. § 13981;

Count Four: assault and battery;

Counts Five and Six: negligent and intentional transmission of a venereal disease;

Counts Seven and Eight: negligent and intentional infliction of emotional distress;

Count Nine: negligent supervision and retention of Imbesi;

Count Ten: unlawful retaliation for James's refusal to testify falsely on Imbesi's behalf in the Goodwin litigation, ultimately resulting in her constructive discharge, contrary to the Conscientious Employee Protection Act, N.J.S.A. 34:19-3;

Count Eleven: wrongful discharge;

Counts Twelve and Thirteen: conspiracy to deprive James of her civil rights as a prospective witness in the Goodwin litigation, contrary to 42 U.S.C.A. § 1985(2) and 42 U.S.C.A. § 1986.
James alleged that Click and North American were the "alter egos" of Imbesi and his brothers, and that each defendant *741 should be held jointly and severally liable. She also claimed that defendants were directly liable for their own misconduct, and vicariously liable for Imbesi's misdeeds. James sought compensatory damages for lost earnings, physical and psychological injuries, and punitive damages.
Imbesi retained Dilworth Paxson (Dilworth) to defend him in the Federal Action. All defendants filed motions to dismiss. By memorandum decision and order dated January 27, 1998, the court: (1) dismissed with prejudice the claims under 42 U.S.C.A. § 1985(2) and § 1986 as against all defendants; and (2) dismissed without prejudice the majority of state law claims against Click, North American, Imbesi, and Imbesi's three brothers, declining to exercise supplemental jurisdiction over those claims. After this decision and order, the only remaining claims in the Federal Action were against Imbesi for: (1) gender-motivated violence contrary to the VAWA (Count Three); and (2) assault and battery (Count Four).
About six months later, on August 5, 1998 James commenced an action in the Court of Common Pleas of Philadelphia County, by filing a civil summons and jury demand (Philadelphia Action). The named defendants were the same as in the Federal Action: Click, North American, Imbesi, and Imbesi's three brothers. James later provided Imbesi, Click, and North American with a draft copy of a complaint she intended to file in the Philadelphia Action, in which she asserted those claims over which the federal court declined to exercise supplemental jurisdiction. James, however, never actually filed a complaint in the Philadelphia Action.

2. The Settlement

Throughout the course of this litigation and even before this litigation began, the parties engaged in settlement discussions. On August 25, 1998 a settlement conference was held before federal Magistrate Judge Peter B. Scuderi.
On November 9, 1998 the parties agreed to a tentative settlement, contingent upon their obtaining permission for the Philadelphia Action to proceed under seal and using pseudonyms. The parties filed a joint petition requesting this relief. Also pursuant to the tentative settlement, the defendants filed a writ of summons in the Court of Common Pleas, Philadelphia County, against Fireman's, American Motorists, Lumbermens, and Harleysville, seeking a declaration that the insurance carriers were obligated to defend and indemnify them with respect to any costs, attorneys' fees, settlements, judgments, or monetary awards arising from or relating to the Philadelphia Action. Finally, also pursuant to this tentative settlement, on November 30, 1998 the federal court dismissed the remaining claims against Imbesi, those for assault and battery and violation of VAWA.
On December 16, 1998 James declared the tentative settlement null and void, because the parties had been unable to obtain an order permitting the Philadelphia Action to proceed under seal. James then filed a motion in federal court, seeking to vacate the dismissal of her claims, which the court granted.
Despite the collapse of the tentative settlement, the parties continued to engage in settlement discussions in which American Motorists and Lumbermens participated. Although advised of these discussions, Harleysville chose not to participate. Settlement conferences were held before Judge Scuderi on January 19 and 25, 1999 at which Harleysville did not appear. Pursuant to these discussions, and with the federal court's approval, on January 25, 1999 James filed an amended complaint in the Federal Action, in which she reasserted *742 all the claims from her original complaint, except the claims under 42 U.S.C.A. §§ 1985(2) and 1986, which had been dismissed with prejudice.
After considering the submissions of James's counsel and representations made by counsel at the January 25, 1999 settlement conference, Judge Scuderi stated in two terse, conclusory letters dated February 8 and 9, 1999 (Appendices B and C) that $4.15 million constituted a reasonable settlement figure for the case, in exchange for a consent judgment in plaintiff's favor on Counts I(LAD), II(LAD), V (negligent transmission of a venereal disease), and VII (negligent infliction of emotional distress) of the amended complaint, and dismissal, with prejudice, of the remaining counts.
In February 1999, James entered into a confidential settlement agreement (Settlement or Settlement Agreement) with: (1) defendants Imbesi, Click, and North American; (2) insurers, American Motorists and Lumbermens; and (3) Patricia Imbesi (Imbesi's wife). Imbesi executed the agreement on behalf of himself, Click, and North American. Imbesi's three brothers entered into a separate settlement agreement with James, Click, North American, American Motorists, and Lumbermens.
The Settlement Agreement provided, in pertinent part:
(1) A Consent Judgment would be entered in the Federal Action, in favor of James, against Imbesi, Click, and North American, jointly and severally, in the amount of $4.15 million, on the LAD sexual harassment claims (Counts One and Two), the claim of negligent transmission of a venereal disease (Count Five), and the claim of negligent infliction of emotional distress (Count VII). No part of the $4.15 million would be deemed attributable to James's claim for punitive damages. Payment of the $4.15 million would be structured as follows:
(a) Imbesi, Click, and North American agreed to pay James $550,000. They also agreed to assign to James their rights to prosecute and recover from the "Non-Settling Insurers," Fireman's and Harleysville, any amounts attributable to the Federal and Philadelphia Actions. Finally, they guaranteed James payment of an additional $150,000, payable in full within two years of the Settlement, if, as of that date, James had received no money from the Non-Settling Insurers. However, James agreed to reimburse Imbesi, Click, and North American for this "guarantee payment," depending upon the amount she eventually received from the Non-Settling Insurers.
(b) American Motorists and Lumbermens agreed to pay James $200,000. They also guaranteed payment of an additional $100,000, payable in full within two years, if, as of that date, James had received no money from the Non-Settling insurers, Fireman's and Harleysville. However, James agreed to reimburse American Motorists and Lumbermens for this "guarantee payment," depending upon the amount she eventually received from the Non-Settling Insurers; and
(c) Dilworth was retained to represent Imbesi, Click, North American, and James in an action against the Non-Settling Insurers, seeking, among other things: (1) attorneys' fees and costs incurred in connection with the Federal Action, the Philadelphia Action, and the declaratory judgment action; (2) the up-front payments of $750,000, made to settle the dismissed claims; (3) the guarantee payments of $250,000; (4) the remaining $3.15 million of the total Settlement amount; and (5) damages for bad faith, for failing to settle James's claims within the policy limits, and *743 failing to defend Imbesi, Click, and North American against James's claims.
(2) James agreed to dismiss with prejudice the remaining claims in her Federal Action, and in her Philadelphia Action, and release all other claims and causes of action she might have against Imbesi, Click, North American, American Motorists, and Lumbermens.
(3) Imbesi, Click, and North American agreed to dismiss, without prejudice, their declaratory judgment action in the Court of Common Pleas, Philadelphia County, and release all claims against James, American Motorists, and Lumbermens.
The parties agreed that the Settlement was fair, reasonable, and made in good faith, based upon their competing estimates of James's injuries, and the potential for liability on her claims. Pursuant to the Settlement, on March 5, 1999 the parties stipulated to a judgment in James's favor on Counts One, Two, Five, and Seven of the complaint, and to the dismissal with prejudice of the remaining counts. In a separate, and again a terse, conclusory documentation of "findings," also dated March 5, 1999, Judge Scuderi found that the Settlement was fair and reasonable, and was entered into in good faith (Appendix D). By order dated March 9, 1999 the federal court sealed and impounded the case record and by order dated March 17, 1999 the federal court dismissed the case in accordance with the parties' stipulation. Finally, also pursuant to the Settlement, James voluntarily dismissed the Philadelphia County Action.

I-D. Insurance Coverage

1. Fireman's

During an eight-month period of James's employment, between June 1996 and February 1997, Imbesi was insured under a Homeowner's Policy issued by Fireman's, which had an effective coverage date of between June 25, 1996 and June 25, 1997. When advised of James's Federal Action, Fireman's initially agreed to provide Imbesi with a defense. Fireman's asserted, however, that the majority of the claims fell outside the scope of its coverage.
Following the federal court's January 27, 1998 order, dismissing the majority of James's claims, Fireman's withdrew its defense, taking the position that the remaining claims, for assault, battery, and gender-motivated violence under the VAWA, were not covered under its policy. Fireman's also denied coverage with respect to the subsequent Philadelphia Action.

2. American Motorists

During a fourteen-month period of James's employment, between July 1995 and September 1996, North American and Click were named insureds under the following policies issued by American Motorists: (1) Commercial General Liability Policy, effective September 8, 1994 to September 8, 1995; (2) Commercial General Liability Policy, effective September 20, 1995 to September 20, 1996; and (3) Excess Liability Policy, effective June 13, 1995 to September 20, 1996. American Motorists denied coverage for James's claims.

3. Lumbermens

For a fourteen-month period of James's employment, between July 1995 and September 1996, North American and Click were named insureds under a workers' compensation and employers' liability policy issued by Lumbermens, effective June 13, 1995 to September 20, 1996. By letter dated May 29, 1997 Lumbermens stated it would provide a defense and potential indemnification for Click and North American under this policy, with respect to James's claims of sexual harassment under *744 the LAD (Counts One and Two), and her claims of negligence and negligent infliction of emotional distress (Counts Seven and Nine). However, Lumbermens denied coverage for: James's additional claimed causes of action; any claims involving intentional conduct; punitive damages; and non-bodily injury.

4. Harleysville

a. The Policies

During a five-month portion of James's employment, between September 20, 1996 and February 1997, Click and North American were covered by the following insurance policies issued by Harleysville, which had coverage dates of September 20, 1996 to September 20, 1997:
(1) Commercial General Liability Policy. This policy excluded from coverage all employment-related injuries, and all injuries arising from employment practices. The policy covered executive officers and directors, such as Imbesi, but only with respect to their official duties.
(2) Commercial Blanket Excess Liability Policy. This policy excluded from coverage all employment-related injuries, and all injuries arising from employment practices. Executive officers, directors, and stockholders, such as Imbesi, were covered, but only while acting within the scope of their official duties.
(3) Workers' Compensation and Employers' Liability Policy. This policy insured only North American and Click. It did not insure officers, directors, or shareholders of the corporations, such as Imbesi. The Workers' Compensation portion of the policy covered accidental bodily injuries, or diseases caused or aggravated by the conditions of employment.
The Employers' Liability portion of the policy covered accidental bodily injuries arising out of and in the course of the injured employee's employment, and bodily injury by disease caused or aggravated by the conditions of employment. Under Exclusion C5, the Employers' Liability Policy excluded from coverage damages for "bodily injury intentionally caused or aggravated" by the insured (emphasis added).
In addition, under Exclusion C7, the Employers' Liability Policy excluded from coverage "damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions." Under Schmidt v. Smith, 155 N.J. 44, 713 A.2d 1014 (1998), Exclusion C7 was void as against public policy to the extent it purported to deny coverage for bodily injuries arising from the conduct described, including emotional injuries accompanied by physical manifestations.

b. Harleysville's Denial of Coverage

Even before James commenced the Federal Action, Dilworth advised Harleysville of James's allegations, and requested coverage. After having reviewed a draft copy of James's complaint, in a letter dated March 31, 1997 Harleysville advised Dilworth that it was denying coverage under the Commercial General Liability Policy and the Commercial Blanket Excess Liability Policy.
In letters written after the Federal Action had been filed, Dilworth again requested coverage from Harleysville. In two letters dated December 30, 1997, one addressed to North American and Imbesi's three brothers and the second addressed to Click and Imbesi, Harleysville denied all coverage for James's claims in the Federal Action, with the exception of James's claims that: (1) North American and Imbesi's three brothers should be held vicariously *745 liable for Imbesi's misconduct; and (2) North American and Imbesi's three brothers were negligent in their supervision of Imbesi. As to these two claims, Harleysville agreed to provide a defense to North American and Imbesi's three brothers, under the Commercial General Liability Policy.
However, Harleysville denied indemnity under all three of its policies. Harleysville denied coverage under the Employers' Liability Policy on the basis of Exclusion C5, for intentional conduct, and Exclusion C7, for damages arising out of "coercion, ... discipline, ... harassment, humiliation, discrimination against or termination of any employee or any personnel practices, policies, acts, or omissions."
Harleysville denied coverage to Imbesi, individually, because he was alleged to have engaged in intentional misconduct. Harleysville denied coverage to Click and North American because they were allegedly Imbesi's alter ego. Harleysville denied coverage to Imbesi's three brothers to the extent they participated in, ratified, or acquiesced in Imbesi's misconduct.
Harleysville further stated that the insureds' failure to provide relevant disclosures regarding Imbesi's pre-policy conduct, as referenced in James's complaint, could amount to misrepresentations sufficient to void the policies altogether, and to exclude all coverage that might otherwise apply.
Finally, Harleysville disclaimed liability for James's damages, other than those resulting from unintentional bodily injuries, which occurred in employment-related activities, during the time period the policies were in effect. In this regard, Harleysville stated its belief that James's damages arose from a single course of conduct, commencing prior to the policy period. Therefore, none of her damage claims were covered.
After receipt of the January 27, 1998 opinion and order in the Federal Action, which dismissed the majority of James's claims, Harleysville advised that it would not provide Click or Imbesi with a defense or indemnification as to the remaining causes of action, i.e., assault and battery, and gender-motivated violence contrary to the VAWA.
After James filed the Philadelphia Action, Dilworth made additional requests for coverage, advising Harleysville of the new litigation, and the parties' settlement discussions. In October 1998, James's counsel also wrote to the various insurance carriers, advising them of the tentative settlement of the Federal and Philadelphia Actions, and asking if they had any objections to it.
Harleysville responded to James's counsel by stating it was in the process of evaluating insurance coverage issues relating to the Philadelphia Action. Harleysville objected to unilateral settlement of that lawsuit. It also requested a copy of the proposed settlement agreement which Dilworth agreed to provide only if Harleysville agreed to maintain its confidentiality.
By letter dated November 11, 1998 Harleysville denied coverage with respect to the Philadelphia Action. In a letter dated December 4, 1998 Harleysville provided the reasons for its denial of coverage, which largely mirrored the reasons given in its three previous denial letters, relating to the Federal Action. Harleysville also declined invitations to participate in the parties' continuing settlement discussions.

c. Harleysville's Declaratory Judgment Action

On December 11, 1998 Harleysville filed a complaint in the Court of Common Pleas, Montgomery County, Pennsylvania, naming *746 as defendants: North American; Click; Imbesi; Imbesi's three brothers; Fireman's; American Motorists; and Lumbermens. Harleysville sought a declaratory judgment that it had no obligation to provide a defense or indemnification to Click, North American, Imbesi, or Imbesi's three brothers with respect to James's claims in her Federal and Philadelphia Actions.
After the Settlement, on March 26, 1999 Harleysville filed an amended complaint in its declaratory judgment action: (1) adding James as a defendant; and adding alternative claims that (2) the Settlement was not made in good faith, was unreasonable, and was the product of collusion, and Harleysville had no obligation to pay any portion of the settlement amount, and (3) if coverage were found, Harleysville was entitled to contribution from, or indemnification by, American Motorists, Lumbermens, and Fireman's. Harleysville's Pennsylvania declaratory judgment action eventually was dismissed.

II

A. The Parties and Their Claims

Fireman's commenced the present litigation on November 17, 1998, prior to the Settlement of the Federal and Philadelphia Actions, and prior to Harleysville's declaratory judgment action in Montgomery County, Pennsylvania. In its original complaint, Fireman's named as defendants Imbesi, American Motorists, Lumbermens, and Harleysville, and sought: (1) a declaratory judgment that the homeowner's policy it had issued to Imbesi did not provide coverage for James's claims; or (2) alternatively, should coverage be found to exist, indemnification from American Motorist, Lumbermens, and Harleysville. On February 11, 1999 after the Settlement, Fireman's filed an amended complaint, adding Click, North American, and James as defendants.
Imbesi, Click, North American, and James answered Fireman's amended complaint, denying that Fireman's was entitled to the relief it sought. Imbesi and James also asserted counterclaims against Fireman's: (1) seeking a declaratory judgment that the homeowner's policy provided coverage for James's claims; (2) alleging breach of contract and bad faith refusal to indemnify and settle James's claims; and (3) seeking an award of attorneys' fees. Imbesi also asserted a counterclaim against Fireman's, alleging bad faith refusal to defend.
Imbesi, Click, North American, and James also asserted cross-claims against Harleysville: (1) seeking a declaratory judgment the policies issued by Harleysville provided coverage for James's claims; (2) alleging breach of contract and bad faith refusal to settle or indemnify; and (3) seeking an award of attorneys' fees. Imbesi, Click, and North American also cross-claimed against Harleysville alleging bad faith refusal to defend.
American Motorists and Lumbermens separately answered Fireman's amended complaint, denying any obligation to provide coverage for James's claims, except as provided under the terms of the Settlement. Lumbermens also asserted a cross-claim against Harleysville, seeking contribution as to the defense costs incurred in the underlying litigation. Harleysville denied liability on all claims.
Harleysville then filed an amended answer to Fireman's amended complaint, and to the cross-claims asserted by Imbesi, Click, North American, James, and Lumbermens. Harleysville continued to deny liability on the claims asserted against it. Harleysville also asserted a counter-claim against Fireman's, and cross-claims against American Motorists, Lumbermens, *747 Imbesi, Click, North American, and James, seeking a declaratory judgment that it had no obligation to provide coverage for James's claims, or, alternatively, seeking indemnification from the other insurance companies. Harleysville also filed amended cross-claims against Imbesi, Click, North American, and James.

B. Summary Judgment Motions

In February 2001, Fireman's, American Motorists, and Harleysville moved for summary judgment, seeking dismissal of all claims against them. At the same time, Imbesi, Click, North American, and James moved for partial summary judgment, seeking judgment in their favor on Counts One and Two of their cross-claim against Harleysville, for declaratory judgment and breach of contract.
By oral decision and order dated March 1, 2001, the judge granted Fireman's summary judgment motion, and dismissed all claims against it. Also on March 1, 2001 the judge denied both Harleysville and American Motorists' summary judgment motions, and granted, in part, the summary judgment motion filed by Imbesi, Click, North American, and James. The judge orally held that, under Schmidt, 155 N.J. 44, 713 A.2d 1014, Harleysville had a duty to both defend and indemnify Click and North American, with respect to James's sexual harassment claims under the LAD, to the extent the alleged harassment resulted in bodily injuries. That duty arose under Harleysville's Employers' Liability Policy.
Harleysville moved for reconsideration and also moved for a ruling it was not estopped from challenging the enforceability of the Settlement, and seeking apportionment of reasonable defense costs. After hearing oral argument, the judge entered separate orders dated May 2, 2001: (1) denying Harleysville's motion for reconsideration; but holding that (2) Harleysville was not estopped from challenging any aspect of the Settlement; and (3) Harleysville was required to reimburse Lumbermens for no more than twenty-five percent of reasonable defense costs incurred by Lumbermens in defending Click and North American in the underlying litigation.
On May 22, 2001 Harleysville moved for leave to appeal from the judge's orders denying its motion for summary judgment, and its motion for reconsideration. This court and the Supreme Court denied the motions for leave to appeal.
On June 14, 2001 upon further consideration of Harleysville's motion for summary judgment, the judge granted partial summary judgment in favor of Harleysville, holding that Harleysville was not liable for the defense costs of Imbesi, Click, and North American, and dismissing these parties' cross-claims against Harleysville. However, the judge maintained her earlier holding that Harleysville was obligated to reimburse Lumbermens for twenty-five percent of the reasonable attorneys' fees and costs Lumbermens incurred in defending Click and North American in the underlying litigation.
On June 22, 2001 Harleysville filed another motion for summary judgment. This time, Harleysville sought: (1) judgment that the Settlement was unreasonable, collusive, and not entered into in good faith; and (2) dismissal of all remaining claims against it. In support of this motion, Harleysville submitted, among other things, an expert report from John J. Gibbons, Esq., former Chief Judge of the United States Court of Appeals for the Third Circuit. (See Appendix A.) Judge Gibbons reasoned that the Settlement, although summarily approved by Judge Scuderi, was unreasonable because: (1) it was based upon inadmissible net opinions of *748 attorneys, and not upon an evaluation of the competing evidence relating to the likelihood of James's success on the merits and her alleged damages; and (2) it did not represent a good faith compromise on the part of James, because the Settlement amount of $4.15 million exceeded any settlement or verdict ever reported in any New Jersey case involving sexual harassment or negligent transmission of a venereal disease, exceeded the verdict in the Goodwin litigation, and most likely exceeded the amount James could have recovered and sustained had the case been tried to a jury. Judge Gibbons stated:
24. In sum, it is my opinion that the settlement reached in the James litigation is not reasonable because it does not represent a good faith comprise of James's claims and there was an insufficient record upon which Magistrate Judge Scuderi could approve the settlement. Clearly, the amount of the consent judgment would not have been considered by the parties were the insurance companies not the responsible entities.
On July 2, 2001 the judge entered an amended scheduling order. As it relates to the present appeal, the judge ordered that a jury trial would be limited to the issue of James's compensatory damages, the category of damages for which James had settled, and the appropriate allocation of such damages "between and among the defendants." Thereafter, on July 20, 2001 the judge granted partial summary judgment in favor of Harleysville, declaring that the Settlement was unreasonable. However, the judge denied the portion of Harleysville's motion that requested dismissal of all claims against it.
Harleysville moved for reconsideration of both the July 2 and July 20, 2001 orders which the judge denied. Harleysville also moved for leave to appeal, which both this court and the Supreme Court denied.
On October 10, 2001 Click and North American moved to compel James to file a pleading, setting forth all claims she intended to present against Imbesi, Click, and North American, including a prayer for relief. In response, James filed a cross-claim against Click and North American, asserting claims of quid pro quo and hostile work environment sexual harassment under the LAD, the only claims as to which the court found insurance coverage, which Click and North American moved to dismiss based upon the terms of the Settlement. Harleysville also moved to dismiss James's cross-claim, under R. 4:6-4(b)(1), on the grounds that it was improper.
During oral argument on October 26, 2001 the judge initially indicated an intent to deny the motions to dismiss James's cross-claims. However, the court reserved judgment in order to consider the effect of our decision in Pasha v. Rosemount Mem'l Park, Inc., 344 N.J.Super. 350, 781 A.2d 1119 (App.Div.2001), certif. denied, 171 N.J. 42, 791 A.2d 221 (2002), decided just ten days earlier.
In an oral decision on January 18, 2002 based upon Pasha, the judge ruled that the Settlement was unenforceable against Harleysville as unreasonable and collusive. This ruling had the effect of: (1) foreclosing any recovery by Imbesi, Click, North American and James on their cross-claims against Harleysville; and (2) granting judgment in favor of Harleysville on its cross-claims against the other co-defendants, with the exception of the partial summary judgment which had been entered in favor of Lumbermens on the issue of defense costs.
In accordance with her January 18, 2002 oral decision, and her earlier decision regarding the allocation of defense costs, *749 in an order dated January 31, 2002, the judge: (1) directed that Harleysville reimburse Lumbermens in the amount of $11,400, representing twenty-five percent of the reasonable legal fees and costs incurred in defending the underlying litigation; and (2) vacated the orders of July 20 and August 31, 2001, entered summary judgment in favor of Harleysville, and consistent therewith, dismissed with prejudice all remaining claims and cross-claims asserted by all parties.
James filed a timely notice of appeal and Harleysville filed a timely notice of cross-appeal.

III
As the sole issue in her appeal, James contends the judge erred in refusing to enforce the Settlement against Harleysville, based upon her findings that the Settlement was unreasonable and collusive. She urges, alternatively, if we decline to hold that the Settlement is reasonable as a matter of law the case be remanded for a plenary hearing on the issue of reasonableness, before a different judge. James now contends Judge Cooper has pre-judged this issue. If, after such a hearing, the judge finds the Settlement amount unreasonable, then James contends a trial should be held on the merits of her sexual harassment claims under the LAD, the amount of her compensatory damages, and the portion of those damages which Harleysville should be held liable to pay. James contends, however, that no damages should be allocated between and among Imbesi, Click, and North American.

A. Standard of Legal Review

This issue was decided on summary judgment. Our standard of review is the same as that of the trial judge's. Sojourner A. ex rel. Y.A. v. New Jersey Dept. of Human Serv., 350 N.J.Super. 152, 163, 794 A.2d 822 (App.Div.), certif. granted, 174 N.J. 194, 803 A.2d 1165 (2002); Antheunisse v. Tiffany & Co., Inc., 229 N.J.Super. 399, 402, 551 A.2d 1006 (App. Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). The judge must determine whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the disputed issue in favor of the non-moving party. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 539-41, 666 A.2d 146 (1995).
If there is a genuine issue as to any material fact, then summary judgment should be denied. R. 4:46-2(c). However, if the evidence is "`so one-sided that one party must prevail as a matter of law,'" then summary judgment must be granted. Brill, 142 N.J. at 540, 666 A.2d 146, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986).
The applicable law is well-established.
"Where an insurer wrongfully refuses coverage and a defense to its insured, so that the insured is obliged to defend himself in an action later held to be covered by the policy, the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him. The only qualifications to this rule are that the amount paid in settlement be reasonable and that the payment be made in good faith."
[Griggs v. Bertram, 88 N.J. 347, 364, 443 A.2d 163 (1982), quoting Fireman's Fund Ins. Co. v. Sec. Ins. Co. of Hartford, 72 N.J. 63, 71, 367 A.2d 864 (1976), quoting New Jersey Mfrs. Indem. Ins. Co. v. United States Cas. Co., 91 N.J.Super. 404, 407-08, 220 *750 A.2d 708 (App.Div.1966) (emphasis added).]
"[A] settlement may be enforced against an insurer in this situation only if it is reasonable in amount and entered into in good faith." Id. at 368, 443 A.2d 163 (emphasis added).
Thus, as a preliminary matter, James is incorrect when she argues that, in order to deny enforcement of the Settlement against Harleysville, we are obligated to find both that the Settlement was unreasonable and that it was made in bad faith. Rather, under Griggs, 88 N.J. at 364-68, 443 A.2d 163, the judge should deny enforcement if either of those conditions exist.
The New Jersey case upon which James relies does not support her argument on this point. See Battista v. W. World Ins. Co., Inc., 227 N.J.Super. 135, 146-51, 545 A.2d 841 (Law Div.1988) (refusing to enforce settlement that was unreasonable in amount, but made in good faith) aff'd in relevant part, and rev'd in part sub. nom, Battista v. Olson, 250 N.J.Super. 330, 594 A.2d 260 (App.Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991). The only case James cites which is supportive of her argument comes from another jurisdiction. This case is unpersuasive in light of the Supreme Court's explicit, contrary holding in Griggs, 88 N.J. at 364-68, 443 A.2d 163. See Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 279-80 (Minn.1990).
The insurer bears the ultimate burden of persuasion by a preponderance of the evidence. The insurer is not liable if the settlement is either unreasonable, or was reached in bad faith. Griggs, 88 N.J. at 365-68, 443 A.2d 163. The insured, however, bears the initial burden of production or the burden to produce evidence to support the reasonable and good faith nature of the settlement. The insured is presumed to possess all essential information necessary to make such a determination. Id. at 367-68, 443 A.2d 163.

1. Reasonableness

The judge held that the Settlement amount was unreasonable on its face, to the extent Harleysville was obligated to pay at least $3.15 million of the $4.15 million Settlement figure. The judge found that reasonable minds could not differ on this issue. She concluded that summary judgment was appropriate, and a plenary hearing was unnecessary. As a result of this finding, and her additional finding that the Settlement was collusive, the judge denied enforcement of the Settlement against Harleysville and entered judgment in its favor.
James claims the court's determination of unreasonableness was incorrect. James's primary contention is that without a finding that Judge Scuderi abused his discretion in approving the Settlement, the judge in New Jersey is bound by his finding that the Settlement amount was reasonable. For this argument, James primarily relies upon federal court decisions involving the review of class-action settlements, a review required under Fed. R.Civ.P. 23(e). James's argument misapprehends the applicable law and is based upon faulty logic.
Under Griggs, 88 N.J. at 364-68, 443 A.2d 163, it is the court's obligation to conduct an independent review of the Settlement in order to determine whether it is reasonable and made in good faith. See also, Cont'l Cas. Co. v. Hempel, 4 Fed. Appx. 703 (10th Cir.2001) (mere fact that judge approved settlement is insufficient to render it reasonable). Here, there are at least two ways in which the Settlement amount is unreasonable on its face: (1) the entire $4.15 million is attributed to James's compensatory damages, with none allocated *751 to punitive damages; and (2) Harleysville is deemed liable disproportionately to pay, at the very least, seventy-six percent of the Settlement amount, $3.15 million, and perhaps even the entire Settlement amount of $4.15 million, even though Harleysville insured Click and North American for only five of James's nineteen months of employment.
The judge could find these particular aspects of the Settlement amount unreasonable without questioning Judge Scuderi's more general conclusory finding that the overall $4.15 million constituted "a reasonable settlement figure" for James's LAD claims, and her claims for negligent transmission of a venereal disease and negligent infliction of emotional distress.
Judge Scuderi did not find that $4.15 million represented a reasonable evaluation of James's compensatory damages. As discussed, the parties never presented Judge Scuderi with the evidence necessary to make such a conclusion. We conclude it extremely doubtful that such a conclusion could ever be reached under the circumstances of this case.
In addition, Judge Scuderi never found that assigning Harleysville liability for $3.15 million of the $4.15 million Settlement amount, or even potentially the entire $4.15 million, was reasonable. We conclude it extremely doubtful that such a finding could be reached.
Judge Scuderi found only, and very generally, that the parties' proposed settlement agreement constituted "a reasonable and good faith resolution of the difficult issues in this case." There is no conflict between that very general finding, and a specific finding by this court that the Settlement amount is quite unreasonable in its particular context and allocations.
Our grounds for concluding that the Settlement amount is unreasonable substantially overlap with our bases for concluding that the Settlement was collusive and made in bad faith. See Midwestern Indem. Co. v. Laikin, 119 F.Supp.2d 831, 843 (S.D.Ind.2000) (issues of bad faith or collusion closely related to issue of reasonableness of settlement amount, and evidence often overlaps). We discuss these points now and we find the Settlement unreasonable on its face.

2. Bad Faith and Collusion

In addition to finding the Settlement unreasonable, the judge found the Settlement "unconscionable." The judge explained that her finding of unconscionability meant that the Settlement was "beyond unreasonable," and entailed "a collusive aspect" such as to meet the standard of unreasonableness and bad faith set forth in Griggs, 88 N.J. at 364-68, 443 A.2d 163. James contends this finding was also erroneous.
We recently addressed the issues of bad faith and collusiveness in the context of finding a settlement agreement unenforceable against an insurance company. Pasha, 344 N.J.Super. 350, 781 A.2d 1119. In Pasha, plaintiffs were the five surviving children of Dorthea Coleman. During Coleman's burial, her casket tilted while being lowered into the grave and it fell to the bottom. When the casket was retrieved, water had seeped into the structure. After being "reconditioned," Coleman's body was buried at a different site. Id. at 353, 781 A.2d 1119.
The plaintiffs sued the cemetery, Rosemount, seeking damages for emotional distress resulting from mishandling a corpse. Rosemount notified its insurance company of the claim and the company denied coverage.
*752 The plaintiffs and Rosemount then entered into a settlement agreement in the amount of $500,000. Rosemount agreed to pay $30,000, and assigned to plaintiffs its rights against its insurance company. The plaintiffs agreed to pay Rosemount one-third of the amount they recovered against the insurance company, up to a maximum of the $30,000 Rosemount had paid to settle. Pursuant to the settlement, a consent judgment was entered in favor of the plaintiffs against Rosemount.
The parties agreed that Rosemount's $30,000 payment, and the plaintiffs' agreement to repay that amount if they were successful in their suit against the insurance company, would be kept confidential. No similar confidentiality agreement was entered into with respect to the $500,000 nominal settlement amount, which plaintiffs intended to make public, to serve as a "wake-up call." Id. at 353-54, 781 A.2d 1119.
On a motion for summary judgment, the judge entered judgment in favor of the insurance company, finding the settlement collusive. Id. at 354-55, 781 A.2d 1119. We affirmed. Id. at 355-59, 781 A.2d 1119. We held that the plaintiffs had not satisfied their burden under Griggs, 88 N.J. at 364-68, 443 A.2d 163, to produce evidence that the settlement agreement was reasonable in amount and entered into in good faith. Id. at 356-59, 443 A.2d 163.
To satisfy their burden of production, the plaintiffs in Pasha had submitted: (1) a certification from their own attorney; (2) a certification from Rosemount's attorney; and (3) a certification from an expert that the settlement was reasonable. Id. at 356-57, 781 A.2d 1119. We faulted the attorneys for failing to identify the factors they took into consideration in the settlement of the case, or the factors which ordinarily affect such cases in general, and for failing to discuss the plaintiff's damages or injuries, physical, psychological or otherwise. Id. at 357, 781 A.2d 1119.
We also faulted the expert for concluding that the settlement was reasonable, without giving a proper explanation based upon the facts of the case. The expert noted only that the settlement was reasonable: (1) in light of the "extremely wide range of sustainable verdicts and even greater range of reasonable settlements"; (2) the fact that the case would be tried in Essex County, where "juries tend to award higher verdicts than juries elsewhere in all types of cases"; and (3) the plaintiffs shared the ethnic characteristics of those who might be expected to serve as jurors. Ibid.
We found that the attorney and expert certifications contained "nothing but guesswork and unsupported anecdotal references." Id. at 359, 781 A.2d 1119. These were "wholly insufficient to satisfy [the plaintiffs'] burden under Griggs." Ibid. In finding collusion, we also relied upon the terms of the settlement agreement. We emphasized the disparity between the amount paid by Rosemount to the plaintiffs, just $30,000, with the total amount of the settlement, $500,000. Id. at 357-58, 443 A.2d 163. We found additional evidence of collusion in the parties' agreement to publicize the $500,000 settlement, but to conceal Rosemount's responsibility for paying only $30,000, an amount which Rosemount could recover if the plaintiffs were successful in pursuing their claim against the insurance company. Id. at 358, 443 A.2d 163. We conclude here that James also failed to meet her burden of production.

IV

IV-a. The Evidence Produced by James

James presented little or no competent evidence to support the reasonableness *753 and good faith nature of the Settlement. She relied upon the following:
(1) the allegations in her complaint;
(2) the affidavit of Alan D. Berkowitz, a Pennsylvania attorney specializing in labor and employment law, who expressed that: (a) "[i]n light of the grossly egregious conduct of which Mr. Imbesi and the two corporations that he controls are accused, and the severe damages that flow from such conduct, from a defendants' employment lawyers' point of view, we believe that a stipulated judgment in the range of $3,000,000 to $5,000,000 for compensatory damages only on Counts I, II, V and VII of the Amended Complaint would be quite reasonable and appropriate"; and (b) "the Confidential Settlement Agreement is reasonable in its entirety [sic], particularly in light of the fact that two insurance companies have refused, to date, to indemnify and defend Mr. Imbesi, Click Corporation of America, Inc. and North American Beverage Company";
(3) the affidavit of Patricia V. Pierce, an attorney admitted to practice in Pennsylvania, New Jersey and California, specializing in labor and employment law, expressed that: (a) "[i]n light of the criminal nature of the conduct that Mr. Imbesi perpetrated on Ms. James, and the lifetime of physical and psychological damages from which she will suffer, it is my opinion that a stipulated judgment in the range of $5,000,000 to $10,000,000 for compensatory damages only on Counts I, II, VI and VII of the Amended Complaint would be quite reasonable and appropriate. A jury would probably return a verdict substantially in excess of this range"; and (b) "the Confidential Settlement Agreement is reasonable in its entirety, particularly in light of the fact that two insurance companies have refused, to date, to indemnify and defend Mr. Imbesi, Click Corporation of America, Inc. and North American Beverage Company"; and
(4) statements made by her counsel during a January 25, 1999 settlement conference before Judge Scuderi. There is no transcript of that conference. However, counsel for Imbesi has sworn that James's counsel presented "evidence of the nature and scope of James's asserted injuries," the verdict in the Goodwin litigation and "evidence of sexual harassment verdicts nationwide that exceeded ... $6 million." A letter from James's counsel, to counsel for Imbesi, demanding $6 million in settlement, provides no greater justification for a $6 million settlement demand, other than to suggest that Philadelphia juries have "a well deserved reputation for large ... verdicts."
First, plaintiff was not entitled to rely upon the naked allegations of her complaint, which have no evidentiary value. She was obligated to come forward with evidence to support those allegations. Vargas v. Hudson Cty. Bd. of Elections, 949 F.2d 665, 674 (3d Cir.1991) ("[i]n deciding whether a settlement is prudent and reasonable, a court must consider the risk to the settling parties. It is the extent of the defendants' exposure to liability and not mere allegations in the plaintiffs' complaint that govern the appraisal of reasonableness"); Excelsior Ins. Co. v. Pennsbury Pain Ctr., 975 F.Supp. 342, 356 (D.N.J.1996) (same, quoting Vargas).
Second, the opinions of Berkowitz, Pierce and James's counsel constitute inadmissible net opinions because the attorneys never stated a factual basis for their opinions, grounded in the evidentiary record. These net opinions could not be considered by the trial judge as proof that the Settlement was reasonable and entered into in good faith. Buckelew v. Grossbard, 87 N.J. 512, 524-25, 435 A.2d 1150 (1981); Smith v. Estate of Kelly, 343 N.J.Super. *754 480, 497-98, 778 A.2d 1162 (App.Div.2001); Jimenez v. GNOC, Corp., 286 N.J.Super. 533, 540-43, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). See also, Brill, 142 N.J. at 523, 540, 666 A.2d 146 (on summary judgment, evidentiary materials must be "competent").
For example, Berkowitz reasoned that "severe damages flow" from conduct such as that alleged against Imbesi. However, Berkowitz never identified any evidence supporting the truthfulness of James's allegations against Imbesi, nor did he identify any particular damages James had suffered.
Similarly, Pierce stated that, while she represented Goodwin in her litigation against Imbesi, she prepared James as a witness, and deposed and cross-examined Imbesi. Based upon those experiences, Pierce credited James's version of events over that of Imbesi. However, Pierce did not state any factual basis to support her credibility determination stating only vaguely that she was "quite familiar with numerous ways in which Mr. Hamburg [would] impeach [Imbesi's] credibility." Moreover, while Pierce thought that James had suffered a "lifetime of physical and psychological damages" from Imbesi's "criminal" conduct, she did not specify any medical evidence to support such a conclusion. Pierce also made no attempt to differentiate between Imbesi's individual liability and the liability of Click and North American. In this regard, Pierce gave no consideration to the fact that the most severe conduct alleged, Imbesi's alleged criminal sexual assault against James, may well not be covered and insured against.
The only verdict and settlement Berkowitz and Pierce cited in support of their opinions were from the Goodwin litigation. The Goodwin verdict and settlement, however, do not support James's claim that the multi-million dollar Settlement in the present case was reasonable or made in good faith. Indeed, they support the opposite conclusion.
Specifically, the Goodwin verdict consisted of $2.1 million in punitive damages, which was subsequently cut to $100,000, the applicable statutory limit under Title VII, and only $325,041 in compensatory damages. Here, on the other hand, the $4.15 million Settlement supposedly represented a fair valuation of James's compensatory damages alone, without any consideration of punitive damages.
Finally, the arguments allegedly made by James's counsel, during the January 25, 1999 settlement conference before Judge Scuderi, were not fleshed out in the factual record and are difficult to assess. Based upon the limited information provided, it appears those arguments suffer from the same flaws as the Berkowitz and Pierce affidavits.
In sharp contrast to the essentially nugatory or conclusory affidavits of Berkowitz and Pierce, and the arguments of James's counsel, is the affidavit of former Chief Judge of the Third Circuit, John Gibbons, submitted by Harleysville in support of its motion for summary judgment. James does not dispute the veracity of Judge Gibbons's affidavit.
In his report (Appendix A), Judge Gibbons cited to specific evidence which casts doubt upon the truthfulness of James's allegations against Imbesi. He also surveyed all reported New Jersey verdicts and settlements in sexual harassment cases, and cases involving the negligent transmission of a venereal diseasetwo of the three claims James "settled" for $4.15 million. Based upon his review of those cases, Judge Gibbons stated that $4.15 million was higher than any settlement or verdict ever reported in such a case. Moreover, Judge Gibbons noted that the *755 largest portion of all of the verdicts he reviewed was the award for punitive damages, not the award for compensatory damages. Judge Gibbons concluded that the $4.15 million very likely exceeded the amount James could have recovered had the case been tried. Therefore, the Settlement did not represent a true, good faith compromise of James's claims.

IV-b. Imbesi's Failure to Rebut James's Valuation

The record also reveals that Imbesi and the other defendants failed to mount any substantial challenge to James's valuation of the case. Indeed, in a letter to James's counsel, just prior to the January 25, 1999 settlement conference, Imbesi's counsel conceded that a multi-million dollar settlement was reasonable. Imbesi's failure to rebut James's valuation of the case also supports a finding of collusiveness and bad faith. Cont'l Cas. Co., 4 Fed.Appx. 703, 717 (10th Cir.2001) ("Among the indicators of bad faith and collusion are ... lack of serious negotiations on damages") (quoting Stephen R. Schmidt, The Bad Faith Setup, 29 Tort & Ins. L.J. 705, 721 (1994)).
Specifically, the record reveals that in the January 25, 1999 settlement conference, Imbesi relied exclusively on the arguments of his counsel. Again, since there was no transcript made of the conference, it is difficult to evaluate the substance of those arguments. However, according to counsel's affidavit, her remarks at the conference were limited to: (1) Imbesi's claim that his relationship with James was consensual; and (2) conflicts and uncertainties in James's deposition testimony. Significantly, as in Pasha, 344 N.J.Super. at 357, 781 A.2d 1119, Imbesi's counsel did not challenge James's valuation of her compensatory damages, and failed to discuss James's damages or injuries, physical, psychological or otherwise.
We find it reasonable to question why Imbesi failed to challenge James's valuation of her claims, and instead accepted the concept that James should receive millions of dollars in compensatory damages. The apparent answer to that question leads to yet an additional inference that the Settlement was collusive and made in bad faith.
Specifically, the record reveals that no discovery had ever been taken with respect to the state law claims for which James obtained a consent judgment and $4.15 million in compensatory damages. The majority of James's claims, including the claims for which she obtained a consent judgment, were dismissed from the Federal Action by order dated January 27, 1998. Thereafter, James never filed a complaint in state court, reasserting the claims which had been dismissed. Apparently, James only reasserted and revived those claims in federal court on January 25, 1999 in order to resolve them as part of the Settlement.
All discovery in the Federal Action, including the depositions of both James and Imbesi was necessarily limited to the two claims remaining in the Federal Action for assault and battery and gender-motivated violence. The record suggests that James's deposition was taken in the Federal Action. However, the transcript of that deposition is not part of this appellate record. The record contains only the transcript for James's deposition in the present declaratory judgment state litigation. The evidence necessary to prove such claims is not co-extensive with the claims for which James obtained a consent judgment. Indeed, the claims of assault and battery and gender-motivated violence were made against Imbesi, individually, and not against Click and North American Harleysville's insureds under the Employers' Liability Policy implicated in this case. *756 Therefore, no evidence was recorded relating to the liability of Click and North American for Imbesi's alleged misconduct.
In addition, and perhaps even more significantly, despite the parties' agreement that James suffered at least $4.15 million in compensatory damages, there is no evidence that James ever submitted to an independent examination by a medical doctor or a psychological expert engaged by the defendants to evaluate her claims of physical and psychological injuries. Although Imbesi originally had sought a psychiatric examination of James, the parties agreed to postpone that examination pending the outcome of their settlement discussions. Thus, there was never any independent medical evidence marshaled and available to support, refute or confirm the nature and extent of James's alleged physical and psychological injuries. See, e.g., Griggs, 88 N.J. at 368-69, 443 A.2d 163 (in remanding for determination on issues of reasonableness and good faith, finding it significant that insured failed to conduct basic physical examination or deposition of the plaintiff and that insured did not question factual basis of amount of settlement).
As to this issue, the record clearly suggests James's alleged injuries are not as serious as she claims. First, James admitted in interrogatory answers she suffered from "emotional problems" before she met Imbesi. Therefore, there is some reason to question the extent to which Imbesi, Click and North American may be held liable for her psychological condition.
Second, there exists one affidavit from James's treating psychiatrist, Dr. Shively, which predates the February 1999 Settlement. It was submitted to the state court in the Philadelphia Action, in support of the parties' joint motion to proceed under seal. There is no evidence that this affidavit was submitted to Judge Scuderi, although it was submitted to the trial court in the present litigation.
In this affidavit, Dr. Shively stated that James suffered flashbacks, generalized chronic anxiety, depression, sleeplessness, weight loss and fear of being in public places. However, Shively also stated that James had made "significant progress" and that "the quality of [James's] life ha[d] improved considerably."
Our reading of the record reflects that, at all times, the parties were primarily interested in disposing of the case and suing the carriers. Serious settlement discussions began before the litigation was filed. Of course, there exists a strong public policy in favor of settlements. Zuccarelli v. State Dept. of Envtl. Prot., 326 N.J.Super. 372, 380, 741 A.2d 599 (App. Div.1999), certif. denied, 163 N.J. 394, 749 A.2d 368 (2000). That policy, however, does not excuse insureds from their obligation, under Griggs, 88 N.J. at 364-68, 443 A.2d 163, to present sufficient evidence to support the reasonableness and good faith nature of their settlement.
The lack of an evidentiary basis to support this $4.15 million Settlement stands in stark contrast to the sort of detailed examinations of the potential for liability and damages, including extensive, detailed discussions of the underlying facts and expert opinions, which courts have found sufficient to support the reasonableness of a settlement agreement in this insurance context. See, e.g., Midwestern, 119 F.Supp.2d at 845-51; Excelsior, 975 F.Supp. at 354-61.

IV-c. The Terms of the Settlement

An examination of the terms of the Settlement Agreement also support a finding of bad faith and collusion. The first suspicious term is the allocation of the entire $4.15 million Settlement to *757 compensatory damages, with no portion allocated to punitive damages.
Both sides in the Federal action benefitted from this allocation. Imbesi, Click and North American benefitted because punitive damages are generally neither insured against nor insurable. Johnson & Johnson v. Aetna Cas. and Sur. Co., 285 N.J.Super. 575, 580-89, 667 A.2d 1087 (App.Div.1995). James benefitted because she avoided the problem of recovering a punitive damages award from Imbesi, whose assets may be non-liquid and difficult to value, or otherwise difficult to reach.
The only entities disadvantaged by this allocation are the Non-Settling Insurers, specifically Harleysville, because, while punitive damages are not covered and insured, compensatory damages potentially are, if they relate to a bodily injury James suffered, arising from her employment with Click and North American. Schmidt, 155 N.J. 44, 713 A.2d 1014.
Finally, as discussed previously, there is no evidence to support a conclusion that James suffered $4.15 million in compensatory damages, and no New Jersey jury has ever awarded such a large amount in compensatory, or even punitive damages, in cases involving claims similar to James's. Thus, this term of the Settlement Agreement clearly represents an inappropriate attempt to squeeze a settlement for both compensatory and punitive damages into a sum for compensatory damages alone, solely for the purpose of obtaining insurance coverage. As such, it constitutes evidence of collusion and bad faith. Cont'l Cas. Co., 4 Fed.Appx. 703, 717 (10th Cir. 2001) (negotiated settlement "becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are ... attempts to affect the insurance coverage, ... and attempts to harm the interest of the insurer") (quoting Stephen R. Schmidt, The Bad Faith Setup, 29 Tort & Ins. L.J. 705, 721 (1994)).
A second suspicious Settlement term is the disparity in the amounts paid by the settling parties and the total amount of the Settlement. Specifically, James agreed to accept $750,000 from Imbesi, Click, and North American, and $250,000 from American Motorists and Lumbermens, and to seek the remaining $3.15 million from Harleysville and Fireman's. Furthermore, depending upon her success against the Non-Settling Insurers, James agreed to reimburse up to $250,000, the "guaranteed payments," to the settling parties.
The third suspicious term is James's agreement to waive her right to proceed against Imbesi, Click and North American, should she be unable to recover from Harleysville. This aspect of the Settlement raises strong suspicions of bad faith or collusion by the parties, to recover an unreasonable Settlement amount from the Non-Settling Insurers. Griggs, 88 N.J. at 370, 443 A.2d 163. Indeed, we conclude this aspect of the Settlement provides strong evidence that the $4.15 million settlement amount was a sham, which did not truly represent James's actual losses. If it did, why would she be willing to settle for "only" $1 million and risk the possibility of recovering nothing from the Non-Settling Insurers? We conclude that she agreed to accept $1 million from the settling parties because she believed $1 million was reasonable in the circumstance to compensate her for her losses. Any balance recovered over $1 million was essentially serendipitous.
Finally, a fourth suspicious term is the parties' agreement to hold Harleysville responsible for paying, at the very least, $3.15 million of the $4.15 million Settlement. *758 Harleysville insured Click and North American for only five months of James's nineteen-month period of employment, while American Motorists and Lumbermens insured the companies for fourteen months of her employment. One might expect American Motorists and Lumbermens to be held responsible for paying more than Harleysville or at least a more proportionate ratio. However, that is not the case under the terms of the Settlement. Those companies agreed to pay only $300,000, while Harleysville was expected to pay at least $3.15 million.
It is possible, as James contends, that she suffered the more severe damages during the five months of her employment which were insured by Harleysville. It is during this time period that she allegedly contracted herpes from Imbesi, and he allegedly raped her. Nevertheless, these alleged facts do not justify holding Harleysville responsible for $3.15 million of the $4.15 million Settlement, more than three-fourths.
Clearly, from James's complaint, Imbesi's alleged sexual harassment was a continuous course of conduct, commencing from the very start of her employment. In the temporal context, it is reasonable that American Motorists and Lumbermens should be responsible for a greater portion of the Settlement than Harleysville. Moreover, there is legitimate reason to question whether these alleged injuries, resulting from Imbesi's criminal conduct, were attributable vicariously to Click and North American and conduct insured against by the carriers. Given this situation, we would have expected James to demand greater payments from Imbesi, American Motorists and Lumbermens. However, she did not.

IV-d. Concealment

Finally, unlike in Pasha, 344 N.J.Super. at 358, 781 A.2d 1119, we find no evidence of an intent by the parties to "conceal" the terms of their Settlement from the Non Settling Insurers. Indeed, the Settlement anticipated future litigation against the Non-Settling Insurers, in which, of necessity, the Settlement Agreement would be disclosed. Moreover, the evidence shows that the parties attempted to involve the Non-Settling Insurers in the settlement discussions.
Moreover, in the present case, the parties intended to keep the entire Settlement Agreement confidential, except as necessary to pursue their claim against the Non-Settling Insurers and not just those aspects of the Settlement which were deemed controversial. It is apparent from the record that the parties' reasons for keeping the Settlement confidential were valid, and related to the scandalous nature of James's allegations and Imbesi's conduct. For example, as part of their earlier, unsuccessful settlement negotiations, the parties had jointly moved in the Philadelphia Action to proceed under seal by using pseudonyms. Furthermore, as part of the successful Settlement, the parties sought and obtained an order from the federal court, sealing and impounding the case record.
Lack of concealment, however, does not entail a finding that the Settlement was made in good faith and without collusion by the parties. Concealment constitutes only one means of establishing collusion or a lack of good faith. Midwestern, 119 F.Supp.2d at 843; Pasha, 344 N.J.Super. at 356-59, 781 A.2d 1119.
Consideration of all other factors leads us to the conclusion that the Settlement was unreasonable and collusive, and made in bad faith.

V

James's Alternative Argument
As an alternative argument, James contends that the reasonableness and good *759 faith nature of the Settlement amount cannot be decided on this record alone, and a plenary hearing is necessary on these issues. James also suggests a method for conducting that hearing, including a different judge, in any further proceedings which may be necessary, should the Settlement be deemed unreasonable. We conclude that the Settlement was unreasonable on its face, collusive and entered into in bad faith. We find the evidence on these issues was so one-sided that reasonable minds could not differ. Summary judgment was appropriately entered in Harleysville's favor and a plenary hearing is unnecessary. No reasonable fact-finder could reach a contrary conclusion. We conclude that the $4.15 million settlement and judgment was contrived to optimize the benefits of the settling parties, to the detriment of the holdout carriers, on damages, coverage and liability and was entered into in bad faith without any sound relationship to the realities of the situation. The claimant recovered $1 million in damages, a reasonable sum in compensation. The balance of $3.15 million is not justified by the indisputable facts.

VI
As to Harleysville's cross-appeal, the Law Division held that, under the Employers' Liability portion of its Workers' Compensation and Employers' Liability Policy, Harleysville was obligated to defend and indemnify Click and North American with respect to James's claims of sexual harassment under the LAD, to the extent James suffered bodily injury as a result. The judge based this decision on her interpretation of Schmidt, 155 N.J. 44, 713 A.2d 1014.
In its cross-appeal, Harleysville contends this holding was erroneous and represents an incorrect interpretation of Schmidt. More specifically, Harleysville contends that it owed no duty to defend or indemnify Click and North American, under the Employers' Liability Policy: (1) because Exclusion C5 excluded from coverage "bodily injury intentionally caused or aggravated" by the insured; and (2) because public policy prohibits Click and North American from being insured for intentional acts of sexual harassment and sexual assault. At the time of oral argument, counsel for cross-appellant advised us that if we affirm on the direct appeal, "this concludes the case" and we need not decide the cross-appeal. We agree and dismiss the cross-appeal.
Affirmed on the appeal; dismissed on the cross-appeal.

APPENDIX A

PRIVILEGED AND CONFIDENTIAL

FIREMAN'S FUND INSURANCE COMPANY and FIREMAN'S FUND INDEMNITY CORPORATION, Plaintiffs,

vs.

JOHN C. IMBESI, AMERICAN MOTORISTS INSURANCE COMPANY, LUMBERMAN'S MUTUAL CASUALTY COMPANY, HARLEYSVILLE MUTUAL INSURANCE COMPANY, NORTH AMERICAN BEVERAGE COMPANY, CLICK CORPORATION OF AMERICAN and SALLY JAMES, Defendants.

SUPERIOR COURT OF NEW JERSEY

LAW DIVISION-OCEAN COUNTY

Civil Action

Docket No. OCN-L-3798-98

PRELIMINARY EXPERT REPORT

Introduction
1. I have been asked by Harleysville Mutual Insurance Company ("Harleysville") *760 to offer my opinion as to the reasonableness of the settlement entered into by Sally James, North American Beverage Company, Click Corporation of America, Inc., John Imbesi, and American Motorists Insurance Company and Lumbermens Mutual Casualty Company (hereinafter the "Kemper Insurance Companies"), in an action entitled Sally James v. Click Corporation of America, Inc., North American Beverage Company, John Imbesi, Lawrence Imbesi, Mark Imbesi and Joseph Imbesi, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 97-cv-2736 (hereinafter "James litigation").

Qualifications
2. I am a partner in the law firm of Gibbons, Del Deo, Dolan, Griffinger & Vecchione, a professional corporation. Founded in 1926, the firm currently has 155 attorneys. It maintains offices in Newark, New Jersey, and in New York City. It provides a full range of legal services to a diverse group of clients, with departments specializing in civil and criminal litigation, commercial and corporate law, tax law, employment and labor law, real estate and land use law, environmental law and intellectual property law. The firm has an extensive employment and labor law department, consisting of about 15 attorneys who specialize in handling discrimination claims I am admitted to practice before the Courts of the State of New Jersey, the United States Supreme Court, the Court of Appeals for the Third Circuit, and the United States District Court for the District of New Jersey. I have appeared as counsel in the New Jersey appellate and trial courts and in each of the federal courts mentioned above.
3. I received my B.S. degree from Holy Cross College in 1947, and my LL.B. Cum Laude from Harvard Law School in 1950. At Harvard I served as an editor of the Harvard Law Review. I joined my present law firm, then known as Crummy & Considine, upon graduation from Harvard and was admitted to the New Jersey Bar that same year. In 1954 I became a partner in the firm, which then became known as Crummy, Considine & Gibbons. I remained a partner in that firm until the end of 1969. My practice between 1950 and 1970 included state and federal civil and criminal litigation.
4. In 1960 I was appointed by the New Jersey Supreme Court as a member of the New Jersey Board of Bar Examiners. I became Chairman of that Board in 1963. I was appointed in 1968 by Governor Richard J. Hughes to the New Jersey Council Against Crime, in 1968 to the Council of the New Jersey Department of Community Affairs, and in 1967 to the Governor's Select Commission on Civil Disorders. I have served as a Trustee of the Essex County Bar Association, a Trustee, officer and ultimately President of the New Jersey State Bar Association, and as a member of the House of Delegates of the American Bar Association. I am a Fellow of the American Bar Foundation and a Life member of the American Law Institute.
5. I first became a member of the faculty of Seton Hall University Law School in 1972. I have taught at that Law School; at Duke Law School in Durham, North Carolina; at Rutgers Law School in Newark, New Jersey; at Rutgers Law School in Camden, New Jersey; and at Suffolk University Law School in Boston, Massachusetts. I have served as a member of the Visiting Committee for the University of Chicago Law School. In the course of my academic career I have taught Appellate Advocacy, Contracts, Commercial Law, Conflicts of Laws, Constitutional *761 Law, Federal Jurisdiction and Information and Publication Law. I have published more than 20 articles and review essays in law publications, including the Law Reviews of Columbia University, Duke University, New York University, University of Pennsylvania, University of Pittsburgh, Seton Hall University, Suffolk University, Brooklyn Law School, Cardozo Law School, and New York Law School.
6. In December of 1969 I was nominated to, and on January 15, 1970 I became a judge of, the United States Court of Appeals for the Third Circuit. I became Chief Judge of the Third Circuit at the beginning of 1987 and served in that capacity until January 15, 1990. On that date I retired from the bench. During my judicial service, I participated in several thousand appeals and authored about eight hundred published opinions. A number of my opinions have been included in casebooks used in law schools.
7. Upon my retirement from the bench, I became a tenured professor at Seton Hall University Law School, holding the Richard J. Hughes Chair in Constitutional Law. Shortly thereafter, my old firm, then called Crummy, Del Deo, Dolan, Griffinger & Vecchione, invited me to become Special Counsel. I continued in that capacity until January, 1998, when the firm changed its name to Gibbons, Del Deo, Dolan, Griffinger & Vecchione, and I was named Senior Partner of the firm. Thus, I have remained in the active practice of law since my retirement from the bench. I have argued cases in the United States Supreme Court, the Third Circuit Court of Appeals, the United States District Court, the Supreme Court of New Jersey, and the Superior Court of New Jersey, Appellate, Law and Chancery Divisions. I have also served as an arbitrator or mediator in more than 45 civil disputes.

Legal Assumptions
8. It is not my intention to offer an opinion as to the governing law, since the Court does not ordinarily admit such testimony. See FED. R. EVID. 702; Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery, 177 F.R.D. 245, 264 (D.N.J.1997), vacated in part on other grounds, 179 F.R.D. 450 (D.N.J.1998); Boddy v. Cigna Property & Cas. Cos., 334 N.J.Super. 649, 659, 760 A.2d 823 (App.Div.2000). Before rendering my opinions as to the reasonableness of the settlement in the James litigation, however, it is necessary to identify my assumptions respecting the legal standards governing them. Those assumptions (with which the Court may or may not agree) are as follows:
A. That under New Jersey law where an insurer fails to defendant an insured, a settlement entered into by the insured and a third party may be enforced against the insurer if the settlement is reasonable in amount and entered into in good faith. Griggs v. Bertram, 88 N.J. 347, 368, 443 A.2d 163 (1982).
B. That the New Jersey Supreme Court, in Griggs, set forth a burden-shifting framework to be used when evaluating these settlements:
The initial burden of going forward with proofs of these elements rests upon the insured and the ultimate burden of persuasion as to these elements is the responsibility of the insurer. This rule reasonably accommodates and compromises the competing interests of the parties and considerations of public policy. It will discourage collusive or overreaching impositions upon insurance carriers and, at the same time, will be conducive toward encouraging settlement and protecting an insured in its efforts amicably to resolve *762 a claim against it after having been abandoned by its carrier.

Id. Accord Jefferson Ins. Co. v. Health Care Ins. Exchange, 247 N.J.Super. 241, 248, 588 A.2d 1275 (App.Div.1991); Vargas v. Hudson County Bd. of Elections, 949 F.2d 665, 674 (3d Cir.1991).
C. That the Griggs Court, however, did not define the factors that the trial court should consider when evaluating the reasonableness of a settlement and the good faith of the settling parties. The commentary in the cases that have followed helps shed some light on what factors should be taken into consideration.
D. That in Vargas v. Hudson County Bd. of Elections, the Third Circuit stated that "in determining whether a settlement is prudent and reasonable, a court must consider the risk to the settling party. It is the extent of the defendants' exposure to liability and not mere allegations in the plaintiffs' complaint that govern the appraisal of reasonableness." Vargas, 949 F.2d at 674.
E. That in Luria Bros. & Co., Inc. v. Alliance Assur. Co. Ltd., 780 F.2d 1082, 1091 (3d Cir.1986), the Third Circuit directed that "[i]n order to recover the amount of the settlement from the insurer, the insured need not establish actual liability to the party to whom it has settled so long as a potential liability on the facts known to the insured is shown to exist, culminating in a settlement in an amount reasonable in view of the size of possible recovery and degree of probability of claimant's success against the insured."
F. That in Employers Mutual Liability Ins. Co. of Wis. v. Hendrix, 199 F.2d 53, 60 (4th Cir.1952), the court stated that "in every case of settlement before judgment the reasonableness of the compromise is a proper subject of inquiry which cannot be answered without some examination into the merits of the claim." The court found the settlement unreasonable, noting that no witness with personal knowledge was called to testify and the alleged wrongdoer was neither examined as a witness nor questions as to whether the charges against him were true. Id. at 59.
G. That courts have discussed similar factors that should be considered when evaluating the fairness and reasonableness of settlements in class actions and shareholder derivative suits, and a review of these cases provides additional guidance on the factors that a court should consider when reviewing a settlement.
H. That in those cases, the courts have held that a court cannot approve a settlement that appears to be inequitable or unfair. McCray v. Beatty, 64 F.R.D. 107, 110 (D.N.J.1974).
I. That "[i]n order to approve a proposed settlement, the court must be satisfied that the agreement is `fair, adequate, and reasonable,' and not the product of fraud or collusion." In re Matzo Food Prods. Litig., 156 F.R.D. 600, 604 (D.N.J.1994) (quoting Stoetzner v. United States Steel Corp., 897 F.2d 115, 118 (3d Cir. 1990)).
J. That the court cannot simply "rubber stamp" a settlement based on the arguments and recommendations of counsel. Id. Rather, "[t]o make this determination, the factual record before the [ ] court must be sufficiently developed." Id. (citing *763 Girsh v. Jepson, 521 F.2d 153, 159 (3d Cir.1975)).
K. That the Third Circuit, in fact, has reversed lower courts when the lower courts have approved a settlement without an appropriate record. See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 819 (3d Cir.1995); Girsh, 521 F.2d at 157.
L. That in cases primarily seeking monetary relief, the proposed settlement should be compared to "the present value of the damages the plaintiff would likely recover, if successful, discounted by the risk of not prevailing." D.M. v. Terhune, 67 F.Supp.2d 401, 409 (D.N.J.1999) (citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig., 55 F.3d 768, 806 (3d Cir.1995)). A settlement which is too high in favor of the plaintiff will be considered unfair because a "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." Id.
M. That the New Jersey Appellate Division has held that "[t]he very concept of settlement implies some element of compromise." Battista v. Western World Ins. Co., 227 N.J.Super. 135, 150, 545 A.2d 841 (Law Div.1988), aff'd in part and rev'd in part on other grounds sub nom, Battista v. Olson, 250 N.J.Super. 330, 594 A.2d 260 (App.Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991). The Court further held that despite the fact that an insurer may be estopped from denying coverage for punitive damages if it failed to properly advise the insured of said denial, "the estoppel cannot serve to make it responsible to pay damages in an amount that would never have been considered by the parties were the insurance company not the responsible entity." Id. at 151, 545 A.2d 841
9. Given the foregoing legal assumptions, the task at hand is to opine on the reasonableness of the settlement in the James litigation.

Factual Assumptions
10. Sally James sued, inter alia, John Imbesi and his companies, Click Corporation of American, Inc. and North American Beverage Company, in the United States District Court for the Eastern District of Pennsylvania.
11. James's Complaint alleged, inter alia, sexual harassment in violation of the New Jersey Law Against Discrimination ("LAD"), negligent transmission of a venereal disease, and negligent infliction of emotional distress.
12. The parties sought insurance coverage and indemnification from the defendants' insurers, including Harleysville. With the exception of the Kemper Insurance Companies, all of the insurance companies, including Harleysville, denied coverage.
13. Harleysville had issued three policies to Imbesi's companies, North American Beverage Company and Click Corporation, in the Summer of 1996:(i) Commercial General Liability Policy ("CGL") (MDA 3D 76 29), (ii) Commercial Blanket Excess Liability Policy ("BEL") (BEC 30 76 29), and (iii) Workers Compensation and Employers Liability Policy ("WC/EPL") (WC 30 76 29). These policies were in effect September 20, 1996 to September 20, 1997.
*764 14. The parties and the Kemper Insurance Companies settled the matter for: (i) a payment of $750,000 to James from Imbesi, North American Beverage Company and Click Corporation, (ii) a payment of $250,000 to James from the Kemper Insurance Companies, and (iii) the entry of a consent judgment of $4.15 million, representing compensatory damages only, in favor of James against Imbesi, North American Beverage Company and Click Corporation that could only be executed against the insurance companies that denied coverage.

Materials Examined
15. I have examined the following materials:
A. The pleadings filed in the James litigation.
B. The Confidential Settlement Agreement in the James litigation.
C. The Affidavits of Patricia V. Pierce, Esq. and Alan D. Berkowitz, Esq. which were submitted by James to Magistrate Judge Peter B. Scuderi in the James litigation.
D. The Affidavit of Virginia L. Flick, Esq., submitted in the present litigation that purports to identify what the defendants in the James litigation presented to Magistrate Judge Scuderi.
E. Transcripts of deposition testimony of James and Imbesi in the James litigation.
F. Discovery in the James litigation.
G. Magistrate Judge Scuderi's letters in the James litigation, dated February 8, 1999 and February 9, 1999, and the Court's Findings, dated March 5, 1999.
H. Discovery is the above-captioned matter.
I. Pleadings in the above-captioned matter.
J. Motions filed in the above-captioned matter.
K. Harleysville's policies in effect during James's employment.
L. Complaint filed in Deborah A. Goodwin v. Seven-Up Bottling Company of Philadelphia, Carpenter Realty, Beverage Enterprises, Inc., John Imbesi, Randy Snyder, Joseph Imbesi and Lawrence Imbesi, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 96-cv-2301.

Materials Unavailable
16. Because no record was made, I am not able to review the transcript of the hearing before Magistrate Judge Scuderi on January 25, 1999 in the James litigation.

Reasonableness of the Settlement
17. In analyzing the reasonableness of the settlement in the James litigation, I have considered two distinct issues: (i) whether there was an adequate record before Magistrate Judge Scuderi permitting him to find the settlement reasonable, and (ii) whether the settlement was, in fact, reasonable.
18. While Magistrate Judge Scuderi did not make a record of the hearing on January 25, 1999, in the James litigation, the attorneys for the parties have indicated that the Magistrate Judge had the following materials before him:
 Affidavit of Patricia V Pierce, Esq., attorney for Deborah Goodwin.
 Affidavit of Alan D. Berkowitz, Esq., attorney for Carpenter Realty.
 Arguments of counsel.
Based on these sparse materials, Magistrate Judge Scuderi recommended the settlement *765 of the James litigation include a consent judgment of $4.15 million and concluded that the settlement was reasonable There was no legal requirement that the settlement be approved, and the approval process was not an adversarial proceeding. Harleysville was not a party to that proceeding. For the reasons set forth below, it is my opinion that the settlement was not reasonable.
Initially, the affidavits of Pierce and Berkowitz were inadmissible net opinions, unsupported by any factual evidence or other data. See FED. R. EVID. 702; May v. Atlantic City Hilton, 128 F.Supp.2d 195, 198 (D.N.J.2000); Reed v. Binder, 165 F.R.D. 424, 430 n. 11 (D.N.J. 1996); Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981) (holding that under the net opinion rule "an expert's bare conclusions, unsupported by factual evidence, is inadmissible"). The affidavits presented nothing more than subjective and unsupported speculation about what a jury could award James if she successfully pursued her claim against Imbesi and his companies. See e.g., Kaplan v. Skoloff & Wolfe, P.C., 339 N.J.Super. 97, 102-04, 770 A.2d 1258 (App.Div. 2001) (holding that attorney's opinion of the reasonableness of a divorce settlement was an inadmissible net opinion because the attorney failed to offer any evidential support for his conclusion other than his personal view and experience). Therefore, Magistrate Judge Scuderi's reliance on the affidavits was improper and certainly not sufficient to support a finding that the settlement was reasonable.
More important is the evidence that the Magistrate Judge did not have before him. Because of this striking lack of evidence, the record upon which the Magistrate Judge rules was insufficient to support his finding that the settlement was reasonable. Magistrate Judge Scuderi did not have before him evidence with which he could adequately review the factors bearing on the possibility of liability and amount of damages. The Magistrate Judge did not review any expert reports, deposition testimony or other discovery in the case. It does not appear that the Magistrate Judge even reviewed the pleadings in the matter. Nor did the Magistrate Judge consider the ability of the defendants to pay the settlement or the complexity, length and expense of further litigation.
Clearly, Magistrate Judge Scuderi did not consider the amount of opposition to James's claim because the defendants failed to adequately place such evidence before him. The defendants failed to present the Magistrate Judge with any substantive opposition to James's claims. The defendants failed to present any affidavits or other evidence to challenge the self-serving affidavits presented by James. Ms. Flick, the attorney for the defendants in the James litigation, testified that she only presented evidence of the consensual nature of the relationship between the parties and raised "some issues" as to James's credibility. In fact, there were numerous inconsistencies in James's testimony and instances where she admitted her untruthfulness. For example, James testified that she lied on her resume by indicating that she had a college degree and then gave inconsistent testimony about the reason for failing to complete her college degree. There were also inconsistencies in her testimony about the alleged rape by Imbesi, including evidence that the rape could not have occurred because of the timing of events as she described.
James also testified that despite the alleged rape by Imbesi, she accepted a loan from him of over $13,000, contacted a real estate agent to rent another apartment in the area, and enrolled in the local community *766 college. James also admitted that she engaged in consensual sex with Imbesi, both inside and outside the office. Indeed, the evidence showed that James did not inform anyone of Imbesi's alleged improper conduct until two days after she learned that Imbesi was involved with another woman. This evidence was not reviewed by Magistrate Judge Scuderi.
In addition, the defendants did not present the testimony or report of any economic or psychological experts. Nor did the defendants even have James examined by any doctors. Furthermore, neither James nor the defendants presented the Magistrate Judge with any economic or employability expert reports relating to James's economic loss or ability to return to work. Therefore, the Magistrate Judge could not have considered this important information. In fact, Magistrate Judge Scuderi could not have even reviewed the affidavit of James's treating psychiatrist (Dr. Susan Shively) because it was not prepared until May 5, 1999, over 3 months after the January 25, 1999 hearing.
Furthermore, there was evidence to contradict the severity of James's emotional and physical damages that was not before Magistrate Judge Scuderi. The evidence showed that James has lived a fairly normal life since leaving Imbesi, notwithstanding that she requires medication for herpes. Subsequent to the alleged harassment by Imbesi, James was able to immediately obtain another job, enrolled in college to complete her degree, and shortly thereafter met and married her husband. None of this evidence was apparently presented to or reviewed by the Magistrate Judge.
Based on the foregoing, it is my opinion that the record before Magistrate Judge Scuderi was not sufficient to approve the settlement.
19. As to the actual reasonableness of the settlement, I have surveyed verdicts and settlements involving sexual harassment under the New Jersey Law Against Discrimination ("LAD") and negligent transmission of a venereal disease (the claims upon which the settlement was based). The settlement in the James litigation is higher than any settlement or verdict ever reported in such a case.
20. In cases involving claims of sexual harassment under the LAD, reported settlements, with the exception of one case, have not exceeded $425,000.[1]See, e.g., Ferri v. Department of Corrections, L-1142-96, 1999 WL 33564464 (N.J. Law. Div., Burlington County, Dec. 6, 1999) (parties settled male senior internal investigator's claim of sexual harassment and retaliation for $425,000); Hill v. Bally Entertainment Corp., L-2074-98 (Law.Div., Atl.County, Dec. 1999) (parties settled cigarette girl's claim of sexual harassment and assault for $50,000); Davis v. Carley, N.J. Law. (July 12,1999) and N.J. Law (Dec. 7, 1998) (parties settled deputy attorney general's claim of sexual harassment for $350,000); Herbert v. Haytaian, N.J.L.J. (Aug. 4, 1997) (parties settled GOP assembly staffer's claim for sexual harassment based on unwanted sexual advances *767 and physical contact for $175,000); McCafferty v. Berkowitz, N.J.L.J. (Aug. 4, 1997) (parties settled employee's claim of sexual harassment by director for $210,000); Bellino v. Hudson County Sheriff's Office, N.J.L.J. (Oct. 14, 1996) (parties settled claims of three plaintiffs for sexual harassment based, in part, on inappropriate physical contact for $190,000, $150,000 and $115,000); Paul v. Dorf Feature Serv., N.J.L.J. (Sept. 9, 1996) (parties settled employee's claim for sexual harassment based on her termination for allegedly rebuffing his sexual advances for $200,000); Astin v. Atlantic County Ultil. Auth., N.J.L.J. (Mar. 27, 1995) (parties settled female publicist's claim of sexual harassment by supervisor for $250,000); Plaintiff v. Seaman, N.J.L.J. (Aug. 4, 1997) (parties settled law clerk's claim of sexual harassment against judge for $190,000); Reiner v. Parker, N.J.L.J. (Aug. 4, 1997) (parties settled administrative law judge's sexual harassment claim against supervisory judge for $220,000); Plaintiff v. Hyland, N.J.L.J. (Aug. 4, 1997) (parties settled secretary's claim of sexual harassment against judge for $95,000).
There is nothing about James's case, which likewise included allegations of inappropriate language and physical contact, which distinguishes it for these reported settlements and that justifies a settlement of $4.15 million.
The highest reported settlement of a sexual harassment case under the LAD was in Hurley v. Atlantic City Police Dep't, 174 F.3d 95 (3rd Cir.1999). There, the plaintiff, a female police officer, filed suit against her employer for sexual harassment. The plaintiff claimed that she had been repeatedly subjected to perverse sexual jokes and comments by her male colleagues. For example, the plaintiff was subjected to sexually derogatory comments, gestures and graffiti over a period of years, as well as demeaning transfers and job assignments and the denial of an increase in salary. The plaintiff claimed that she suffered severe emotional distress that interfered with her work, personal life and family life. Subsequently, the plaintiff filed another suit against her employer, alleging that she was retaliated against for filing the initial sexual harassment complaint. After a two-month trial on her initial sexual harassment claim, a jury awarded the plaintiff $575,000 in compensatory damages and $700,000 in punitive damages (a total of $1.275 million). The District Court reduced the compensatory award to $175,000 and upheld the punitive damage award (a total of $875,000). The Third Circuit upheld the reduced $175,000 compensatory award but reversed the $700,000 punitive damage award and remanded for a new trial on the issue of punitive damages. Prior to a new trial, the parties settled both the sexual harassment suit and the retaliation suit for $1.4 million (including attorney's fees).
There are a number of aspects of James's claims that distinguish it from Hurley and demonstrate that the $4.15 million settlement is unreasonable. For example, James was only employed by Imbesi for 1½ years and, for at least some of that time, she was admittedly engaged in a consensual relationship with him. Moreover, unlike Hurley's claim of sexual comments by several colleagues, James claimed that Imbesi was the only one involved in the offensive conduct. James did not allege that her job was adversely changed by way of demotion or reassignment or that her salary was affected. Accordingly, there is no reasonable basis to find that James's claims are worth more than Hurley's claims. Even if an argument is made that James's damages exceeded that of Hurley, Hurley settled both *768 a sexual harassment and retaliation claim for $1.4 million, one-quarter of the settlement made in the James litigation. Thus, in light of the reported settlements of sexual harassment claims under the LAD, the $4.15 million settlement in James the litigation is unreasonable.
21. Even jury verdicts for sexual harassment under the LAD, where juries have expressly found that the plaintiff's claims are supported by the facts and a settlement compromise is nor involved, have not reached as high as the $4.15 million settlement in the James litigation. See, e.g., Camacho v. Country Squire Diner, L-599-96 (N.J.Law.Div., Atl.County, Oct. 1998) (jury awarded waitress $103,900 in compensatory damages and $50,000 in punitive damages against diner and $15,000 against owner for sexual harassment in form of repeated foul and suggestive language, obscene gestures and her termination for complaining about same); Blakey v. Continental Airlines, Inc., 1997 WL 1524797 (D.N.J. Sept. 1997) (jury awarded airline pilot $375,000 for economic loss and $500,000 for pain and suffering, which was remitted by the court to $250,000, for hostile work environment sexual harassment); Widdington v. Servidio, L-7482-94, 1997 WL 33346459 (N.J. Law Div., Hudson County, Sept. 1997) (jury awarded employee $300,000 in compensatory damages, which the court remitted to $90,000, and $2,500 in punitive damages for sexual harassment and emotional distress resulting from comments by supervisor and other employees that supervisor wanted to have oral sex with her while they watched); Lockley v. State of N.J., L-031965-94 (N.J. Law Div., Mercer County, Jan. 1997) (jury awarded male prison guard $750,000 in compensatory damages and $3 million in punitive damages for reverse sexual harassment by female supervisor); Schmidt v. Smith, L-2349-91 (N.J. Law Div. Somerset County, Sept. 1994) (jury awarded plaintiff $80,000 in compensatory damages for sexual harassment, including repeated obscene gestures and touching); Plaintiff v. Defendant (names unknown), L-8472-91, 1994 WL 1874526 (N.J. Law Div., Bergen County, Mar. 1994) (jury awarded secretary $15,000 for sexual harassment by employer who threatened to terminate her if she did not have sex with him); Gares v. Willingboro Twp., 90 F.3d 720 (3d Cir.1996) (jury awarded employee $24,000 in compensatory damages and $38,000 in punitive damages for sexual harassment by police chief); Bouton v. BMW of N. Am., Inc., 90-2884, 1992 WL 1474849 (D.N.J.1992) (jury awarded executive secretary $70,000 in compensatory damages for sexual harassment by two different bosses in form of sexual advances); Caridi v. Port Auth. of N.Y. & N.J., W-019262-89, 1992 WL 1474162 (N.J. Law Div., Hudson County, Oct 1992) (jury awarded police officer $500,000 for emotional distress resulting from sexual harassment in form of inappropriate work assignments, unfounded departmental charges and inadequate supervision by her supervisors of sexual harassment by co-workers); Hutchinson v. Fucili, W-008454089 (N.J. Law Div., Warrant County, Apr. 1991) (jury awarded counter clerk $2,000 for sexual harassment in form of sexual comments and jokes and offer of monetary compensation in exchange for sexual favors, which she resisted).
The most recent jury verdicts subsequent to the January 1999 hearing in the James litigation have not reached that high. See e.g., Layton v. New Jersey Turnpike Auth., N.J.L.J. (June 12, 2000) (jury awarded toll collector $590,000 for the emotional distress she suffered from her supervisor's unwanted physical advances);
*769 Van Ginneken v. Quick Check Corp., L-1256-97 (N.J. Law Div., Morris County, Oct. 1999) (jury awarded male convenience store assistant manager $25,000 for sexual harassment in form of highly offensive comments by female manager); Washington v. Salem Lafayette Assocs., A-5316-97T3 (N.J.App.Div. July 2, 1999) (jury awarded plaintiff $50,000 against former employer for sexual harassment, assault and battery and intentional interference with her employment relationship); Hubis v. Burns Pontiac GMC, No. 98-CV-1360, 2001 WL 34031303 (D.N.J. March 12, 2001) (jury awarded plaintiff $1.5 million for hostile work environment sexual harassment and gender discrimination based, in part, on her supervisor exposing himself to her twice and demoting her), motion for new trial or, in the alternative, remittitur pending.
In the James litigation, the parties did not conclude the matter to trial. There was no finding of liability by the defendants. Instead, James chose to compromise her claim in order to secure a recovery. The very essence of a settlement is a compromise of the amount sought in exchange for an immediate and certain payment. The $4.15 million settlement does not represent a compromise of James's claims, but rather an amount that very likely exceeds what she could have recovered if the matter had been tried and decided by a jury. Hence, it is my opinion that the $4.15 million settlement is not, in fact, reasonable.
22. More enlightening is the comparison of James's case to that of Deborah Goodwin. Goodwin was also employed by Imbesi and his companies for about 1½ years (July 1993-January 1995). She quit her job and filed suit against Imbesi and his companies asserting most of the same claims as those asserted by James (e.g., quid pro quo sexual harassment, hostile work environment sexual harassment, assault and battery, negligent and intentional infliction of emotional distress, and negligent supervision). Goodwin's factual allegations are almost identical to those made by James (e.g. Imbesi repeatedly asked her to engage in oral sex with him, Imbesi asked if she would have his baby, Imbesi asked her if she was a "gagger" or a "swallower", Imbesi retaliated against her for refusing his sexual demands).
Goodwin settled part of her claim with the defendants for $1 million and a jury awarded her $2.5 million on the remainder of her claims, of which about $ 2.1 million was for punitive damages. The Court subsequently reduced the compensatory damage award to $425,041 and the punitive damage award to $100,000, reducing Goodwin's total award to $525,041. In total, Goodwin received approximately $1.525 million for her claims against Imbesi and his companies.[2] In comparison, James settled part of her claim with the defendants for $1 million and has a $4.15 million consent judgment for the remainder of her claims that would, if enforced, give her a total of $5.15 million. Moreover, Goodwin received $425,041 in compensatory damages and James, through the Consent Judgment received $4.15 million. In light of the similarity of the defendants, the nature of the claims and the damages asserted, there is no reasonable basis for James's claims to be worth over $3 million more than Goodwin's claims. Indeed, Goodwin's claims were decided in her favor by a jury and James's claims were never proved but merely compromised in a *770 settlement. It is my opinion that this further demonstrates that the $4.15 million settlement in the James litigation is unreasonable.
23. In cases involving negligent infliction of a sexual disease, the one real distinction between James's claims and Goodwin's claims, jury verdicts have ranged from $93,676 to $357,620. See e.g., In re Moffitt, 254 B.R. 389, 392 (Bankr. N.D.Ohio), aff'd, 252 B.R. 916 (6th Cir. BAP 2000) (jury awarded plaintiff, who contracted genital warts from ex-husband, $100,000 in compensatory damages on her claim of negligence and $175,000 on her claim of intentional infliction of emotional distress); Crawford v. Norris, CV-307-590 (Az. Pima County, Feb. 1997) (jury awarded plaintiff $50,000 in compensatory damages and $150,000 in punitive damages for contracting herpes from defendant who failed to warn her that he had the disease); Meany v. Meany, 639 So.2d 229, 237 (La. 1994) (jury awarded plaintiff $125,000 for ex-husband's negligence in infecting her with genital herpes and venereal arts); Valeska v. Valeska, CV-85-918-PH, 1985 WL 348314 (Ala., Distr. Court, Montgomery County, Dec. 1985) (jury awarded plaintiff $300,000 on claim that she contracted chlamydia from ex-husband which he knew he acquired during an extramarital affair); Stafford v. Stafford, 726 S.W.2d 14, 15 (Tex.1987) (jury awarded plaintiff $257,260 in compensatory damages and $100,000 in punitive damages on claim that ex-husband infected her with chlamydia). See also Duke v. Housen, 589 P.2d 334 (Wy.1979) (reversing jury award of $300,000 in compensatory damages and $1 million in punitive damages on a claim that her boyfriend was grossly negligent when he infected her with gonorrhea because complaint was untimely).
There is nothing about the facts of the James case that sets it apart from these cases or justifies a significantly higher value. James did not take her claim to a jury but decided to compromise the matter through a settlement. Indeed, at trial Imbesi would have PRIVILEGED AND CONFIDENTIAL denied the allegations made by James, claimed that they were engaged in a consensual relationship and testified that he did not believe that the herpes was contagious. In light of the reported verdicts in cases involving claims of negligent infection of a sexual disease, it is my opinion that the settlement of $4.15 million in the James litigation is unreasonable.
24. In sum, it is my opinion that the settlement reached in the James litigation is not reasonable because it does not represent a good faith compromise of James's claims and there was an insufficient record upon which Magistrate Judge Scuderi could approve the settlement. Clearly, the amount of the consent judgment would not have been considered by the parties were the insurance companies not the responsible entities.
25. All opinions in this report are expressed to a reasonable degree of professional judgment.
 4/20/01
 /s/ John J. Gibbons
 JJG/krh
*771 
*772 
*773 APPENDIX D

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SALLY JAMES

Plaintiff,

v.

CLICK CORPORATION OF AMERICA, INC., et al.,

Defendant.

CIVIL ACTION

NO. 97-CV-2736

FINDINGS
AND NOW, this 5th day of March, 1999, upon consideration of the arguments and evidence presented by all interested counsel during a settlement conference held by this Court on January 25, 1999, the parties having advised this Court that they have agreed to all of the terms of a settlement, including this Court's recommendation as to a reasonable settlement amount, the Court makes the following findings:
1. The proposed settlement agreement that was submitted to the Court is a reasonable and good faith resolution of the difficult issues in this case.
2. The parties entered into this settlement agreement in good faith, at arms length and after and as a result of extensive and vigorous negotiations.
3. The settlement adequately takes into account the financial resources of the various parties and appropriately accounts for the substantial risk of a jury verdict in excess of the monies paid and agreed upon judgment.
4. The recommendation that I made at the conference was fair and reasonable and reflects my view of a reasonable resolution of that previously unresolved issue.
5. In light of the substantial and significant harm that would occur to the parties and minor children as a result of public disclosure of the settlement conference and this Order, justice requires that these Findings and any other documents or memoranda issued by this Court with respect to the reasonableness of the settlement amount should be placed and remain under seal.
6. The Clerk shall file these Findings and the Stipulation of the Parties dated March 5, 1999 under seal.
BY THE COURT:
/S/ PETER B. SCUDER, J.
NOTES
[1] The name used in this opinion is fictitious in order to protect the privacy of the party.
[1] For this report I reviewed verdicts and settlements in New Jersey. White James intended to pursue her New Jersey state law claims in Pennsylvania state court, despite the District Court's suggestion that the novel issues presented by the case were best suited for New Jersey state courts, the interpretation of New Jersey state law by New Jersey state and federal courts and juries is most relevant. This is especially true since the New Jersey Law Against Discrimination has been interpreted as one of the broadest and far-reaching anti-discrimination laws and New Jersey courts are prominently known to have interpreted the law favorably to employee claims.
[2] In fact Goodwin received less than $1,525 million because Imbesi, as a part-owner of the defendant companies, in the case that went to the jury, was entitled to recoup some of $1 million settlement by getting a credit for his ownership in the defendant companies.